**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| WESLEY PABST and KATHERINE PABST, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | No. 1:22-cv-1124 JURY TRIAL DEMANDED |
| THE PEOPLES GAS LIGHT AND COKE COMPANY, WEC ENERGY GROUP INC., and THE BROYDRICK GROUP, LLC, | ) ) ) ) ) | |
| Defendants. | ) | |

## <u>CLASS ACTION COMPLAINT</u>

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................ 1

PARTIES ............................................................................................................. 3

JURISDICTION AND VENUE ........................................................................... 4

FACTS ................................................................................................................. 4

A.     The Mahomet Aquifer is the major groundwater resource for east-central Illinois, providing fresh water to more than 500,000 Illinois residents. ........................... 4

B.     Peoples Gas stores natural gas thousands of feet below the Mahomet Aquifer.... 6

    1.     Odorless, colorless, and tasteless, natural gas is dangerous in a confined space. 6

    2.     The natural gas stored by Defendants below the Mahomet Aquifer is not used by or for the benefit of Plaintiffs and the Class. ................................................... 8

    3.     While Peoples Gas has easements or leases for the storage of natural gas, Peoples Gas has a duty to protect the water supply of Plaintiffs and the Class. 11

C.     As a result of Defendants' actions and omissions, the natural gas stored in Manlove Field leaked and contaminated the Mahomet Aquifer. ..................................... 13

    1.     Peoples Gas failed to perform standard tests to ensure the mechanical integrity of the McCord Well connected with Manlove Field. ......................................... 13

    2.     Corrosion of the McCord Well caused a "blow-out," resulting in natural gas being forced into the Mahomet Aquifer. ........................................................... 16

    3.     Defendants withheld material information regarding the contamination of the Mahomet Aquifer from Plaintiffs and the Class. ............................................... 17

    4.     The Gas Defendants' remediation efforts can never restore the Mahomet Aquifer to its prior condition. ............................................................................ 24

D.     The Gas Defendants violated their duties to Plaintiffs and the Class. ................ 25

    1.     The Gas Defendants' duties are defined by statute, regulation, contract, and common law. ..................................................................................................... 25

    2.     The Gas Defendants violated their duties in multiple ways. ............................ 28

    3.     Defendants conspired to misrepresent the extent of contamination in order to cover-up the catastrophe and the risks it posed and continues to pose to the public ............................................................................................................... 31

E.     Plaintiffs and the Class Members have been damaged. ...................................... 35

    1.     Like the Class Members, Plaintiffs receive their water from the Mahomet Aquifer and have been affected by the McCord Well gas leak. ........................ 35

    2.     The contaminated water is not safe and poses serious risk of harm. ................ 36

    3.     Plaintiffs and Class members have reported symptoms of contamination. ....... 37

    4.     Defendants' misconduct has also caused Plaintiffs to suffer property damage and monetary losses. ........................................................................................ 38

CLASS ALLEGATIONS ................................................................ 39

TOLLING/ FRAUDULENT CONCEALMENT ................................ 42

CAUSES OF ACTION .................................................................. 44

COUNT I – VIOLATON OF 18 USC § 1962(C)................................ 44

    1.   The association in fact. ...................................................... 44

    2.   The common purpose.......................................................... 44

    3.   The roles of the participants.............................................. 45

    4.   Pattern of racketeering and predicate acts. ....................... 45

    5.   Affected interstate commerce. ........................................... 46

    6.   Operating and Management............................................... 46

    7.   RICO injury. ...................................................................... 47

COUNT II - VIOLATION OF 18 U.S.C. § 1962(D) (CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(C)) ........................................................................ 48

COUNT III – NEGLIGENCE ........................................................ 49

COUNT IV – STRICT LIABILITY FOR ULTRA-HAZARDOUS ACTIVITY (STORAGE) .............................................................................. 50

COUNT V – STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY (FAILURE TO MAINTAIN MECHANICAL INTEGRITY).............................. 52

COUNT VI – PRIVATE NUISANCE .............................................. 53

COUNT VII – TRESPASS.............................................................. 55

COUNT VIII – BREACH OF CONTRACT ....................................... 56

COUNT IX – RESCISSION OF CONTRACT .................................... 58

PRAYER FOR RELIEF ................................................................ 58

Plaintiffs Wesley Pabst and Katherine Pabst, by and through their attorneys, Fegan Scott LLC and Spiros Law, P.C., for their class action complaint against Defendants The Peoples Gas Light And Coke Company ("Peoples Gas"), WEC Energy Group Inc. ("WEC") (collectively, Peoples Gas and WEC may be referred to as the "Gas Defendants"), and The Broydrick Group, LLC ("Broydrick") (the Gas Defendants and Broydrick may be referred to as "Defendants"), allege and state as follows:

## INTRODUCTION

1. Access to safe drinking water is a basic human right. Clean water for drinking is essential for proper organ function and good health. Clean water for cooking is a necessity so that we can serve healthy meals on our tables. Clean water is necessary for bathing and laundry to curtail the spread of disease. And clean water is essential for the vast farmland and livestock operations on which Illinois is built.

2. Yet, the Gas Defendants caused discharges of natural gas and other combustible gases and hazardous chemicals into the Mahomet Aquifer, the sole source of water for east-central Illinois, from an underground natural gas storage facility it operates in Champaign County, Illinois.

3. Plaintiffs' and Class Members' well and tap water is so contaminated by the gas leak that the water is, or is at risk to become, flammable – potentially for decades to come:



4. Rather than take responsibility, Peoples Gas' position is "tough luck." As a state

court in Champaign County summarized: "If [] Peoples Gas pumped methane, non-potable saltwater, or sarin nerve gas into its storage reservoir, causing it to come through the 'geological strata' to ultimately come out of that Plaintiff's faucet, that is just tough luck." *Eisenmann v. The Peoples Gas Light and Coke Co.,* No. 2018-L-108 (Champaign Co., Ill.) (Order on Defendants' Combined Section 2-615 and 2-619 Motions to Dismiss and Motions to Strike Prayers for Punitive Damages) (Aug. 28, 2020).

5. This class action is pursued on behalf of residents in rural Mahomet, Illinois and Fisher, Illinois from October 25, 2015 to the present (the "Class"). *See* Class and Subclass definitions, *infra*. Plaintiffs and the Class Members have experienced and will continue to experience serious risk of physical harm and property damage caused by the Gas Defendants' deliberate, reckless, and negligent misconduct. The Gas Defendants caused a public crisis by exposing and continuing to expose Plaintiffs and their property to water contaminated by natural gas.

6. All Defendants, including Broydrick, exacerbated the crisis by concealing and misrepresenting its scope, failing to take effective remedial action to eliminate it, and then lying about it to cover up their misconduct through the "Mahomet Aquifer Contamination Enterprise."

7. Defendants' conduct has caused Plaintiffs, Class members, and their property to be exposed to hazardous gases and chemicals, caused damage to the natural resources of the environment in and around Plaintiffs' and Class Members' properties, caused Plaintiffs and Class Members to incur health exposures, loss of use and enjoyment of their property, property damage, loss of quality of life, emotional distress, financial losses, and other damages.

8. Plaintiffs bring this action to recover, individually and on behalf of the Class, for compensatory, exemplar, and consequential damages, and attorneys' fees and costs, pursuant to

the Racketeering Influenced and Corrupt Organizations Act and, under common law, for strict liability for ultrahazardous activities, negligence, nuisance, trespass, and breach of contract.

## PARTIES

9.      Plaintiffs Wesley Pabst and Katherine Pabst (the "Pabst Family") are residents of Champaign County, Illinois and citizens of the United States. Plaintiffs jointly own a home and real property located in rural Mahomet, Illinois, where they reside. The well which services water to their home has been contaminated with natural gas as a result of the Gas Defendants' actions. Moreover, they have suffered damages to their property as a result of Defendants' actions. As a result of Defendants' actions, they have been damaged.

10.     Defendant Peoples Gas is an Illinois corporation with its headquarters and principal place of business located in Chicago, Cook County, Illinois. Peoples Gas is a natural gas provider.

11.     Defendant WEC is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin, and is the parent of Peoples Gas. WEC also maintains additional "headquarters in Chicago, Illinois,"[1] and conducts business in Chicago, Illinois and this District, including, *inter alia,* visits to Chicago by its CEO for oversight and review of the company's projects,[2] the recruitment of employees for its subsidiaries in Chicago,[3] location of employees in Chicago,[4] attendance at trade shows in this District,[5] and the retention of lobbyists in this

---

[1] https://www.wecenergygroup.com/invest/investor.htm
[2] https://www.bizjournals.com/milwaukee/news/2015/11/23/illinois-regulators-launch-investigation-of-wec.html
[3] *See, e.g.,* https://getintoenergy.jobs/chicago-il/engineering-intern-may-2022/2554741BE3CC4272878607564148A210/job/; https://getintoenergy.jobs/chicago-il/tool-repairer/D82A732C82834415A9C32EAC92B4A966/job/
[4] https://www.linkedin.com/in/grace-xue-b9454730/
[5] https://s1.goeshow.com/acma/2019PultrusionConference/ereg683719.cfm?pg=home (reflecting that Paul Gogan of WEC Energy Group would be the keynote speaker at the North American Pultrusion Conference in Rosemont, IL April 8-10, 2019)

3

District.[6]

12.     Defendant The Broydrick Group, LLC is a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, and 18 U.S.C. § 1964(c) for violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.

14.     This Court also has jurisdiction over the subject matter presented by this Class Action Complaint because it is a class action arising under the Class Action Fairness Act of 2005, under 28 U.S.C. § 1332(d)(2), the proposed Class contains more than 100 members, the aggregate amount in controversy exceeds $5,000,000, and at least one Class member is from a state different from one Defendant. Additionally, the Court has supplemental jurisdiction of the state law counts as they arise from the same nucleus of facts as the RICO count.

15.     Venue is proper in this judicial district under 28 U.S.C. § 1391(b)(2) because Peoples Gas resides in this District, and a substantial part of the acts or omissions giving rise to the claims set forth herein occurred in this judicial district. Venue is also proper in this judicial district pursuant to 18 U.S.C. § 1965 because Peoples Gas has an agent in this District, and WEC and Broydrick have transacted their affairs in this District.

## FACTS

**A.     The Mahomet Aquifer is the major groundwater resource for east-central Illinois, providing fresh water to more than 500,000 Illinois residents.**

16.     An aquifer is a body of rock or sediment that is completely saturated – water is in

---

[6] https://www.ilsos.gov/departments/index/lobbyist/lobbyistlist.pdf;
https://www.chicago.gov/content/dam/city/depts/ethics/general/LobbyistStuff/LISTS/LobbyistList.xls

it and all around it. It can be made of sand, gravel, sandstone, or other rocks that can store or transmit water equivalent to an underground river.

17.     The water within an aquifer often begins as rain or melted snow that seeps into the ground. Once underground, water will continue to be pulled downward until it reaches an impermeable layer of rock. The movement of water through rock acts as a natural filtering process, purifying the water and removing sediment.

18.     The Mahomet Aquifer is the most important groundwater resource for east-central Illinois. Composed of sand and gravel, it is part of the buried Mahomet Bedrock Valley. It underlies 15 Illinois counties and ranges from 50 to 200 feet (15 to 60 m) deep.

19.     The vertical and horizontal boundaries of the aquifer generally follow the historic Mahomet Bedrock Valley, where it enters Illinois from the Indiana border on the east to the Illinois River on the west.  The following figure reflects the outline of the aquifer and the counties under which it sits:



20.     The Mahomet Aquifer provides an estimated 220 million gallons of water per

day to communities, agriculture, industry, and rural wells.

21.     The EPA has designed the Mahomet Aquifer as a "Sole Source Aquifer," which recognizes that it is the sole or principal source of drinking water for Illinois residents in these counties.

22.     Designation of the Mahomet Aquifer as a Sole Source Aquifer recognizes that there are no alternative drinking water source(s) that could physically, legally, and economically supply drinking water to all those who depend on the aquifer for such and therefore, if contamination occurs, using an alternative source would be extremely expensive.

**B.     Peoples Gas stores natural gas thousands of feet below the Mahomet Aquifer.**

**1.     Odorless, colorless, and tasteless, natural gas is dangerous in a confined space.**

23.     Methane, the primary component of natural gas (NG), is a potent greenhouse gas. Methane can be flammable and explosive when mixed with air, an asphyxiant, and cause problems with the operation of public and private water systems.

24.     Natural gas can cause death by suffocation if the gas displaces the air in a confined space. A person will experience the following effects as gas concentration increases:

    a.  At 25 to 30% gas in air, the oxygen deficiency can cause ringing in ears, euphoria, and unexplained behavioral changes.

    b.  At 50% gas in air, a person taking in a few breaths will be incapacitated and unable to self-rescue.

    c.  At 75% gas in air, a person is immediately incapacitated and death will occur in a matter of minutes.[7]

25.     Incomplete combustion can occur when the gas mixture is richer than 10%. When

_____

[7] https://pinedalegas.com/natural-gas/hazards-of-natural-gas

this occurs, there is not enough oxygen to completely oxidize all the carbon to carbon dioxide. Some of the remaining carbon reacts to form the incomplete, less stable compound known as carbon monoxide. Carbon monoxide is toxic (poisonous) and can cause physical illness and death when inhaled under certain conditions. It is lighter than air and mixes very thoroughly.

26.     If not contained, natural gas combustion can be hazardous. Uncontrolled combustion causes a very sharp pressure shock wave through a gas / air mixture. If this type of combustion is in an unconfined space (such as in the open atmosphere), the result is a flash fire. If in a confined space, the result is usually an explosion.

27.     Methane in groundwater is not explosive; however, when water containing dissolved methane comes into contact with air in a confined space, the methane could ignite at concentrations between 5 and 15 percent, and result in an explosion. A nearby electrical outlet, pilot light, well pump, or match can be the source for the ignition.

28.     Natural gas is odorless, colorless, and tasteless. Its characteristic aroma is man-made for safety reasons. For natural gas that is provided through a home's gas lines, utilities generally add mercaptan odorants. These odorants are commercial blends of sulfur compounds with a distinctive "rotten egg" smell. The purpose of the odorants is to ensure that a person with a normal sense of smell can detect and identify the gas odor at 1% of gas in air. This is about 1/5th the Lower Flammable Limit.

29.     However, as discussed below, natural gas that has leaked into water aquifers does not yet contain odorants, because it was not intended to be distributed via well water to real

property.

**2. The natural gas stored by Defendants below the Mahomet Aquifer is not used by or for the benefit of Plaintiffs and the Class.**

30.     Illinois does not have any significant natural gas resources in the state.

31.     Accordingly, the Gas Defendants transport natural gas via an interstate pipeline from Texas and other locations to Champaign County and inject it approximately 4,000 feet below the surface into a saltwater aquifer known as the Mt. Simon Sandstone (hereinafter, "the storage stratum") for the sole purpose of storage.

32.     Defendants then withdraw the natural gas they have stored in Champaign County and transport it via intrastate pipeline to Chicago based on demand conditions for natural gas, mostly during winter months.

33.     None of the natural gas stored by the Gas Defendants in Champaign County is distributed or used by consumers in Champaign County.

34.     Natural gas providers source and store natural gas in 24 underground gas storage sites. These gas storage sites in Illinois are primarily in saline aquifer formations (approx. 70%), as well as depleted fields (approx. 30%).[8] To meet the volume and timing of the demand for natural gas in winter months, Illinois has the largest amount of natural gas storage in saline (i.e., deep geologic) formations in the nation, totaling 780 billion cubic feet.



35.     Peoples Gas owns and operates the Manlove Natural Gas Storage Field ("Manlove Field"), an underground natural gas storage facility located in Champaign County, Illinois below the Mahomet Aquifer.

36.     Manlove Field stores natural gas 4,000 feet below the ground in sedimentary rocks. The area underlies approximately 27,500 acres of land. Manlove Field has the capacity to store 36.5 billion cubic feet of natural gas. That is enough gas to warm more than 320,000 homes

---

[8] https://energyinfrastructure.org/~/media/energyinfrastructure/images/ng-storage/updated-2-18/typeofngstoragegraphic-218.png?la=en&hash=0DF480C22D32819E5602DEFCA78D7ABC5E26384F; https://www2.illinois.gov/epa/Documents/iepa/community-relations/mahomet-aquifer/task-force/MATF%20Presentation%20(FINAL).pdf

a year.[9]

37.     Figure 1 below shows the area of northwest Champaign County depicting the topography of the bedrock surface across the Mahomet Dome, the Mahomet Bedrock Valley, tributary bedrock valleys, and adjacent bedrock uplands. The Manlove gas storage field is outlined in the yellow dashed line.[10]

Figure 1:



38.     Defendant owns only a small portion of the real property beneath which it stores the natural gas.

39.     Most of the natural gas is stored beneath privately owned residential and

---

[9] https://www.peoplesgasdelivery.com/company/plant
[10] http://library.isgs.illinois.edu/Pubs/pdfs/specialreports/sp-06.pdf

agricultural property owned by Plaintiffs and the members of the Class.

**3. While Peoples Gas has easements or leases for the storage of natural gas, Peoples Gas has a duty to protect the water supply of Plaintiffs and the Class.**

40.     An injection/withdrawal well is used to inject natural gas into the storage zone, here Manlove Field, and to withdraw natural gas from storage to transport for use.

41.     The EPA designates wells associated with gas and oil production as "Class II wells." According to the EPA, "Class II wells are used to inject fluids associated with oil and gas production. Injection of fluids is typically thousands of feet below the surface into rock formations isolated from underground sources of drinking water." [11]

42.     A picture of a cross section of an injection well follows:



43.     As part of its natural gas storage operation, Peoples Gas operates approximately 153 injection/withdrawal wells along with miles of associated interconnected pipelines, many of

---

[11] https://www.epa.gov/uic/class-ii-oil-and-gas-related-injection-wells

which are located on and under privately owned residential and agricultural property.

44.     In the 1950s and 1960s, Peoples Gas entered into contracts entitled "Gas Storage Grant - Oil and Gas Lease" with the various property owners who owned the property below which the natural gas is stored ("Easement Agreements"). Exemplar Easement Agreements are attached as Ex. A.

45.     The Easement Agreements provided Defendant, in pertinent part, "the exclusive right, privilege, and authority to introduce natural gas or other gases or vapors . . . into any geological strata underlying said land . . .; to store gas in the Storage Reservoir and to retain the possession of gas so stored as personal property; to remove gas (with any water vapors absorbed) from the Storage Reservoir." Easement Agreement, intro. The Easement Agreements also addressed well-drilling (¶ 2) and pipe-laying (¶ 3).

46.     Paragraph 6 of each, however, provides: "Grantee shall, in the course of all operations in this Agreement authorized, use due care to protect Grantor's water supply."

47.     According to a title search on Plaintiffs' property, Peoples Gas has the following easement interests on Plaintiffs' property: Easement to Conduct Exploratory Operations; Option for Gas Storage Easement; Oil and Gas Lease contained in the grant recorded November 30, 1959 (*see* Ex. B) and assigned to Peoples Gas by assignment recorded August 25, 1960 (*see* Ex. C); Easement recorded March 23, 1961; Extention[sic] of Option for Pipeline Right of Way and Easement recorded April 22, 1976 (*see* Ex. D); Notice of Preservation of Interest recorded July 31, 1980 (*see* Ex. E). Collectively, Exs. A-E will be referred to as the "Pabst Easement."

48.     Further, Peoples Gas has interests under a Gas Storage Grant Oil and Gas Lease dated March 20, 1964 (*see* Ex. F) ("Pabst Lease").

49.     Like the Easement Agreements discussed above, the Pabst Easement provides:

"Grantee shall, in the course of all operations in this Agreement authorized, use due care to protect Grantor's water supply."

50.     Similarly, the Pabst Lease provides: "Grantee shall, in the course of all operations in this Agreement authorized, use due care to protect Grantor's water supply."

**C.     As a result of Defendants' actions and omissions, the natural gas stored in Manlove Field leaked and contaminated the Mahomet Aquifer.**

**1.     Peoples Gas failed to perform standard tests to ensure the mechanical integrity of the McCord Well connected with Manlove Field.**

51.     Drilled and installed in 1977, the L. McCord No. 2 well ("McCord Well") is one of the injection/withdrawal wells operated by Peoples Gas. The McCord Well is located at 40.27749 N. Latitude and 88.38961 W. Longitude, in Mahomet, Champaign County, Illinois. A picture of the site where the McCord Well is located follows:



52.     A diagram of the McCord Well follows:



53.     According to the EPA, owners/operators of injection/withdrawal wells like the McCord Well should perform Mechanical Integrity Tests to demonstrate "that there is no movement of fluids into or between underground sources of drinking water (USDWs) associated with injection wells."[12]

54.     Pursuant to 40 C.F.R. § 146.8(a), "an injection well has mechanical integrity if: (1) there is no significant leak in the casing, tubing, or packer; and (2) there is no significant fluid movement into an USDW through vertical channels adjacent to the injection well bore."

55.     An EPA exemplar of internal and external integrity failure of an injection well

---

[12] https://www.epa.gov/sites/default/files/2015-09/documents/r5-deepwell-guidance5-determation-mechanical-integrity-200802.pdf

follows:[13]



56.     In April 1995, Peoples Gas performed its only Mechanical Integrity Test of the McCord Well, 18 years after it was put into operation.

57.     Peoples Gas failed to perform mechanical integrity testing of the McCord Well after 1995, even though the results of the 1995 test showed significant corrosion, with up to 33% metal loss at certain points in the steel piping.

58.     Peoples Gas failed to perform mechanical integrity testing of the McCord Well after 1995, even though this well was constructed with bare, unprotected steel and Peoples Gas knew or should have known that the expected corrosion rate for bare, unprotected steel is generally approximately 10 "mils" per year ("MPY").

59.     A corrosion rate of approximately 1 MPY (one thousandth of an inch or 0.001 inch) is normal. A corrosion rate of 10 MPY requires action be taken. A corrosion rate of 10 MPY will result in 20 cubic feet of material loss per 0.6 miles of pipe.

60.     From April 1995 until 2015, when the McCord Well had a blow-out event (described *infra*), a time span of 20 years, Peoples Gas failed to conduct any mechanical integrity

---

[13] https://www.epa.gov/sites/default/files/2018-06/documents/mechanical_integrity_2018_-_brian_graves.pdf

testing of the McCord Well.

61.     The failure to perform mechanical integrity tests is not an excusable oversight given the significant risks associated with well integrity problems, of which the Gas Defendants were well aware.

62.     The majority of unintended gas releases at natural gas operations are associated with well integrity problems. Methane released from contaminated water wells has been linked with combustion risks inside houses and degraded water quality due to turbidity (the measure of relative clarity of a liquid). Gas migration from injection/withdrawal wells has caused fatalities, fires and explosions, evacuations, exposure to noxious odors, physical symptoms (such as nausea, nosebleeds, and rashes), tropospheric ozone production, and releases of climate-forcing gases.

### 2. Corrosion of the McCord Well caused a "blow-out," resulting in natural gas being forced into the Mahomet Aquifer.

63.     A leak caused by corrosion at the deep and middle locations of the McCord Well developed many years ago, which caused natural gas and corrosive saltwater to leak from the storage stratum into shallower strata and also to fill the annulus (void between piping, tubing or casing and the piping, tubing, or casing immediately surrounding it) of the McCord Well's shallower casings.

64.     Upon information and belief, the leaked natural gas (and the corrosive bacteria it causes to form) and corrosive saltwater corroded the McCord Well's shallower casings.

65.     At some point prior to October 28, 2015, the McCord Well's shallower casings developed points of total corrosion, which began to leak natural gas and non-potable saltwater into the Mahomet Aquifer System as well as cause the buildup of pressure and/or natural gas in

and around the well's shallower casings.

66.    On or about October 28, 2015, the McCord Well experienced a blow-out, which forced a large amount of natural gas and non-potable saltwater from the storage stratum to be injected into the Mahomet Aquifer System, as well as cause a pressure event affecting the water level of the Mahomet Aquifer System.

67.    The blow-out occurred due to multiple points of total corrosion that created a conduit between the highly-pressurized storage stratum where Peoples Gas was storing natural gas and the shallow, low-pressure, strata/stratum that contains the Mahomet Aquifer System.

68.    Upon information and belief, following the blow-out event on or about October 28, 2015, the McCord Well continued to leak large amounts of natural gas and non-potable saltwater directly into the Mahomet Aquifer System and other strata from the storage stratum.

69.    The longstanding leak and ultimate blow-out at the McCord Well caused a large amount of natural gas and non-potable saltwater to escape the storage stratum and leak into the Mahomet Aquifer System, contaminating drinking water for Plaintiffs and the Class.

### 3. Defendants withheld material information regarding the contamination of the Mahomet Aquifer from Plaintiffs and the Class.

70.    On or about December 6, 2016, Peoples Gas discovered gas bubbles percolating in a puddle of water at the surface level near the McCord Well.

71.    Upon information and belief, at no time prior to December 6, 2016 did the Gas Defendants take any action at all in regard to the multiple leaks that were caused by extensive corrosion at the McCord Well.

72.    Upon information and belief, at no time prior to December 6, 2016, did the Gas Defendants take any action, even though these leaks were ongoing for many years and the well had a major blow-out event that occurred on or about October 28, 2015—to such a degree that it

17

changed the water level of the Mahomet Aquifer System by up to 50 feet.

73.     On or about December 14, 2016, Peoples Gas had a Vertilog Magnetic Flux Leakage Inspection test ("Vertilog test") performed on the McCord Well that demonstrated that there were multiple (at least 6) failure locations along the metal piping of the well, including one at approximately the 660-foot depth (a depth where the Mahomet Aquifer System is located), one at the 1,150-foot depth, one at the 3,440-foot depth, one at the 3,500-foot depth, one at the 3,550-foot depth, and one at the 3,600-foot depth.

74.     Shortly after finding the leak, "PGL Storage Field Operations investigated and removed tubing" pipes from the well that were perforated. Pictures of the perforated tubing pipes follow:



Figure 2. Overview of failure locations of tubing pipe. The top photo shows the threaded tube end at the packer in the well. The bottom photo shows approximately twenty-four feet above the bottom of the threaded tube end of the pipe.

75.     On or about December 16, 2016, Mike Jouras, a Senior Engineer/Project Manager for WEC Energy Group,[14] called the Illinois Emergency Management Agency's hotline and made an oral Hazardous Materials Incident Report, reporting that there was an "unknown" amount of "natural gas" leaked into the "air, ground" at a "fixed facility."

76.     These statements were misrepresentations because, at the time they were made, the Gas Defendants knew or should have known the following:

       a.  That non-potable saltwater was leaked in addition to natural gas;

       b.  That the leak occurred underground on private property and not at a fixed facility; and

       c.  That the leak was into the Mahomet Aquifer System and not just into air and ground.

77.     On or about December 16, 2016, Defendant's employee Todd Duffield, a Manager, Engineering Services for WEC Energy Group,[15] made the following oral statements via telephone to the Illinois EPA:

       a.  That it had discovered a "gas pocket" 500 feet below ground;

       b.  That it would "reach out to [the Illinois Department of Natural Resources] to receive approval for gas release when they have a plan together"; and

       c.  That "local monitoring at nearby [water] wells [was] underway and nothing found to date."

78.     These statements were misrepresentations because:

       a.  The Gas Defendants never intended to seek the Illinois Department of Natural Resources' approval for gas release, nor did it do so;

---

[14] https://www.linkedin.com/in/mike-jouras-918a8117b/
[15] https://www.linkedin.com/in/todd-duffield-5399b9b/

    b.   They had not yet engaged in any monitoring of nearby water wells;

    c.   They found "nothing" contaminating nearby water wells because they had not tested any nearby water wells; and

    d.   Had they, in fact, done testing of nearby water wells, the Gas Defendants would have found wide-spread contamination at very high levels.

79.    Upon information and belief, the Gas Defendants voluntarily tested only one nearby water well as part of their initial response on or about December 19, 2016.

80.    Upon information and belief, starting on or about December 19, 2016, and at all times thereafter, the Gas Defendants had actual knowledge that the drinking water from at least one residential water well was contaminated with their own gas.

81.    Starting on or about December 22, 2016, the Gas Defendants, through their employee Thomas Davis, Principal Engineer – Gas Storage, had written confirmation documenting its actual knowledge that the drinking water from at least one residential water well was contaminated with its own gas.

82.    Even after having actual knowledge of contamination from the only nearby residential water well tested, the Gas Defendants failed to disclose this information to any government agency, nearby residents, or the public at large.

83.    On or about January 13, 2017, Peoples Gas' employee Shawn Bartels, Principal Engineer,[16] filed a written Incident Report with the U.S. Department of Transportation Pipeline and Hazardous Materials Safety Administration that contained the following written representations:

    a.   That it released an estimated 39,000,000 cubic feet of natural gas from the

---

[16] https://www.linkedin.com/in/shawn-bartels-08055ba0/

storage stratum at the McCord Well site "in a formation at about 500ft deep";

b. That the gas was leaked only on "operator-controlled property" in the area of "belowground storage or aboveground storage vessel, including attached appurtenance";

c. That the incident involved a "pinhole" leak;

d. That the Potential Impact Radius for the incident was "139 feet"; and

e. That it had conducted a Cathodic Protection Survey on the McCord Well in 2016.

84. These written statements were misrepresentations because:

a. It knew or should have known at the time that it had released a much larger amount of gas than 39,000,000 cubic feet;

b. It found gas contaminating the Mahomet Aquifer System, a groundwater source, not "a formation";

c. It discovered the leak at the McCord Well, which is located on an easement on private property and not on "operator-controlled property";

d. It had actual knowledge, including written confirmation, that the leak was not contained on its own property but had contaminated the drinking water found on the property owned by area residents;

e. It had actual knowledge that the corrosion that caused the leak was not a "pinhole," but that there were multiple (at least 6) failure locations, and that multiple holes had formed at each failure location, with holes as large as 2 3/8 inches, based on observing the piping it removed in December

21

2016 and the results of the Vertilog test it conducted on December 14, 2016;

    f.  It had actual knowledge, including written confirmation, that it had contaminated the drinking water found on the property owned by a local family, which is over 12 times as far as "139 feet" from the McCord Well; and

    g.  It had not conducted a Cathodic Protection Survey on the McCord Well in 2016 or any other recent date.

85.    On or about January 23, 2017, WEC employee Mike Jouras sent a written follow-up to the December 16, 2016 oral report to the Illinois Emergency Management Agency. That report also failed to disclose that the Gas Defendants had actual knowledge that the gas leak contaminated a nearby water well.

86.    On or about February 15, 2017, Peoples Gas received written confirmation that the drinking water from at least two residential water wells was contaminated with its own gas. The Gas Defendants failed to disclose this information to any government agency, nearby residents, or the public at large.

87.    On or about March 28, 2017, Peoples Gas received written confirmation that the drinking water from at least four residential water wells was contaminated with its own gas. The Gas Defendants failed to disclose this information to any government agency, nearby residents, or the public at large.

88.    On or about March 29, 2017, Peoples Gas received written confirmation that the drinking water from at least five residential water wells was contaminated with its own gas. The Gas Defendants failed to disclose this information to any government agency, nearby residents,

or the public at large.

89.　On or about April 26, 2017, an impacted homeowner contacted the Illinois Department of Public Health and informed it that he had just learned that his drinking water had been contaminated by Peoples Gas.

90.　Upon information and belief, at no time between December 19, 2016 and April 26, 2017 did the Gas Defendants inform any government agency, nearby resident, nor the public at large that it had contaminated the Mahomet Aquifer System.

91.　In 2017, Defendant Peoples Gas retained EN Engineering to compose a well assessment report.

92.　On or about June 8, 2017, EN Engineering issued its report titled McCord #2 Well Assessment Manlove Storage Field. The objective of the study was "to provide an assessment and probable causes of the casing and tubing wall loss failures at the McCord #2 Well site at the Manlove Gas Storage Field."

93.　The report that concluded the leak at the McCord Well was ultimately caused by severe corrosion in multiple points and at multiple levels of the approximately 4,000-foot pipe running from the surface level to the storage formation.

94.　The well assessment report by EN Engineering on the cause of the failure of the McCord Well also concluded:

　　　a.　Corrosion caused metal loss to the point of failure at 6 different locations along the piping for the L. McCord #2 well;

　　　b.　A section of the pipe that included 2 of the 6 failure locations was preserved and analyzed, which demonstrated 8 different perforated holes in the metal caused by corrosion;

　　　c.　Corrosion occurred because the production pipe runs 4,221 feet below the surface into a saltwater aquifer that is extremely saline and contains sulfate-reducing bacteria; and

    d. The method for cathodic protection (a technique used to control the corrosion of a metal surface by making it the cathode of an electrochemical cell) that was being used at the L. McCord #2 used an insufficient amount of protective current.

95. According to a February 14, 2018 report by the Illinois State Water Survey entitled "Anomalous groundwater pressure responses in the Mahomet aquifer near the Manlove Gas Storage Field," there was an unnatural water level event in the Mahomet Aquifer System near Manlove Field on or about October 28, 2015, where water levels rose unnaturally high in a very short period of time (up to 50 feet in some locations), indicative of a pressure event caused by a blow-out at the McCord Well.

**4. The Gas Defendants' remediation efforts can never restore the Mahomet Aquifer to its prior condition.**

96. The primary component of the natural gas stored at Manlove Field is methane, a greenhouse gas which is (pound for pound) 86 times more damaging to the environment than carbon dioxide ($CO_2$).

97. The blow-out at the McCord Well caused a large amount of natural gas to escape into the air.

98. Moreover, on or about December 21, 2016, without seeking an air permit or water disposal permit from the Illinois EPA, and without notification to the Illinois DNR, Peoples Gas started a venting operation at the McCord Well, which began venting at least approximately one million cubic feet of gas per day.

99. Between approximately December 21, 2016 and March 21, 2017, Peoples Gas vented methane directly into the atmosphere in and around the homes of Plaintiffs and the Class.

100. On or about March 21, 2017, the Illinois DNR performed an on-site inspection of the McCord Well and learned for the first time that Peoples Gas was conducting an unacceptable and unapproved venting operation of harmful greenhouse gases, without permission or permit,

and ordered it to stop immediately.

101.    On September 14, 2017, after the actual extent of the contamination and damage done to the Mahomet Aquifer System was brought to the attention of State regulators by impacted residents, the Illinois DNR issued a Notice of Violation against Peoples Gas for its illegal contamination and damage to the Mahomet Aquifer System and ordered it to perform remediation of the contamination and damage caused by the blow-out.

102.    Upon information and belief, Peoples Gas will be unable to fully and completely remediate the contamination and damage done to the Mahomet Aquifer System by the McCord Well blow-out.

103.    As a result, the natural gas and methane will move around and in the Mahomet Aquifer, requiring vigilance on the part of Plaintiffs and the Class for when the methane-contaminated water is released into their wells, homes, and properties.

**D.    The Gas Defendants violated their duties to Plaintiffs and the Class.**

**1.  The Gas Defendants' duties are defined by statute, regulation, contract, and common law.**

104.    Peoples Gas obtained Permit No. 5000 dated November 18, 1977 from the Illinois Department of Natural Resources to drill the McCord Well, and has maintained it since that date as a licensed and regulated "Gas Storage Well" pursuant to the Oil and Gas Act, 225 ILCS 725, *et seq*., and the Illinois Department of Natural Resources' Oil and Gas Act Regulations, 62 Ill. Adm. Code 240, *et seq*.

105.    Pursuant to 62 Ill. Adm. Code 240.1852(b), which incorporates the requirements of 62 Ill. Adm. Code 240.630(b), Peoples Gas was required to *ensure at all times* that the McCord Well and all other injection/withdrawal wells were "***maintained in a leak-free***

25

*condition*" (emphasis supplied).

106. Section 1.1 of the Oil and Gas Act, 225 ILCS 725/1.1, prohibits "waste," which

Section 1 of the Oil and Gas Act, 225 ILCS 725/1, defines in pertinent part as:

> (2) permitting the migration of oil, *gas,* or *water* from the stratum in which it is found into other strata, thereby ultimately resulting in the loss of recoverable oil, gas or both;
>
> * * *
>
> (4) the *unreasonable damage to underground*, fresh or mineral *water supply*…
>
> (5) The unnecessary or excessive surface loss or destruction of oil or *gas* resulting from evaporation, seepage, leakage or fire, especially such loss or destruction incident to or *resulting from the escape of gas into the open air* in excessive or unreasonable amounts

(emphasis supplied).

107. The Environmental Protection Act, 415 ILCS 5/3.165, defines "contaminant" as

"any solid, liquid, or gaseous matter, any odor, or any form of energy, from whatever source,"

and Section 12(a) of the Environmental Protection Act, 415 ILCS 5/12(a), provides that it is

unlawful to:

> Cause or threaten or *allow the discharge of any contaminants* into the environment in any State so as to cause or tend to *cause water pollution* in Illinois, either alone or in combination with matter from other sources, so as to violate regulations or standards adopted by the Pollution Control Board under this Act

(emphasis supplied).

108. Section 620 of the Illinois Pollution Control Board Public Water Supplies

Regulations, 35 Ill. Adm. Code 620.301(a), provides:

> No person shall cause, threaten or *allow the release of any contaminant to a resource groundwater* such that:
>
> 1) Treatment or additional treatment is necessary to continue an existing use or

26

to assure a potential use of such groundwater; or

2)  An existing or potential use of such groundwater is precluded

(emphasis supplied).

109.    The Illinois Criminal Code, 720 ILCS 5/47, *et seq*., makes it a criminal offense to create a public nuisance, which it defines as including:

> To permit ***salt water***, oil, ***gas***, or other wastes from a well drilled for oil, gas, or exploratory purposes ***to escape to the surface***, or into a mine or coal seam, ***or into an underground fresh water supply***, ***or from one underground stratum to another***. 720 ILCS 5/47-5(13).

(emphasis supplied).

110.    Peoples Gas entered into written contracts entitled, "Gas Storage Grant - Oil and Gas Lease," with the predecessors in interest to the property owned by Plaintiffs, which provided in pertinent part:

> Grantee shall pay Grantors or their tenants, as their respective interests may appear, for ***all damages occasioned by the*** installation, ***operation***, repair, maintenance, removal or replacement ***of any of said facilities***.
>
> * * *
>
> Grantee shall, in the course of all operations in this Agreement authorized, ***use due care to protect Grantor's water supply***. In the event it is demonstrated that a source of water supply presently used by Grantor is interrupted by Grantee's operation, ***Grantee shall provide an alternate source of water to Grantor for domestic and agricultural use*** during such period as Grantor's water supply is so interrupted.

(emphasis supplied).

111.    The Gas Defendants had a duty to take reasonable precautions in the maintenance and operation of Manlove Field to prevent unreasonable risks of harm to others and others'

property, including Plaintiffs.

112.    The Gas Defendants had a duty to reasonably respond to any leaks or other unpermitted releases of natural gas and non-potable saltwater from Manlove Field to prevent unreasonable risks of harm to others and others' property, including Plaintiffs.

113.    The Gas Defendants had a duty to take reasonable measures necessary to inform any person, including Plaintiffs, about any known contamination of said person's water supply and/or exposure to hazardous chemicals and combustible gas related to their ownership and operation of Manlove Field.

114.    The Gas Defendants had a duty to exercise ordinary and reasonable care to see to it that the McCord Well was reasonably safe and operating in a safe condition so as not to cause damage to those living in its vicinity and their property, including Plaintiffs.

115.    The Gas Defendants had a duty to perform Mechanical Integrity Testing of their gas injection/withdrawal wells pursuant to reasonable gas and oil industry standards, which call for such tests on each well at least every five years.

**2.    The Gas Defendants violated their duties in multiple ways.**

116.    The Gas Defendants violated their duties, including by, *inter alia*:

> a.    failing to maintain the McCord Well in a leak-free condition, in violation of 62 Ill. Adm. Code 240.1852(b) and 62 Ill. Adm. Code 240.630(b);
>
> b.    permitting natural gas and non-potable saltwater from the storage stratum to migrate into the Mahomet Aquifer System, in violation of 225 ILCS 725/1(2);
>
> c.    permitting an unreasonable damage to the Mahomet Aquifer System, an underground fresh water supply, in violation of 225 ILCS 725/1(4);
>
> d.    permitting the leakage of natural gas that resulted in natural gas escaping

into the open air in excessive or unreasonable amounts, in violation of 225
ILCS 725/1(5);

e. causing water contamination to the Mahomet Aquifer System through the
discharge of natural gas and non-potable saltwater from a licensed and
regulated underground gas storage field, in violation of 415 ILCS 5/12(a);

f. causing the release of natural gas into the Mahomet Aquifer System to the
extent that treatment is necessary to continue Plaintiffs' existing use of
this groundwater resource, in violation of 35 Ill. Adm. Code
620.301(a)(3);

g. causing the release of natural gas into the Mahomet Aquifer System to the
extent that Plaintiffs' existing and potential use of this groundwater
resource is now precluded, in violation of 35 Ill. Adm. Code
620.301(a)(3);

h. permitting gas and non-potable saltwater to escape to the surface, in
violation of 720 ILCS 5/47-5(13);

i. permitting gas and non-potable saltwater to escape into an underground
fresh water supply, in violation of 720 ILCS 5/47-5(13);

j. permitting gas and non-potable saltwater to escape from one underground
stratum to another, in violation of 720 ILCS 5/47-5(13);

k. damaging Plaintiffs' and Class Members' property through the release of
natural gas and non-potable saltwater into their freshwater supply, in
violation of the terms of the Gas Storage Grant - Oil and Gas Leases.

l. failing to use due care to protect Plaintiffs' and Class Members' water

supply, in violation of the terms of the Gas Storage Grant - Oil and Gas Leases;

m.  failing to perform Mechanical Integrity Testing of its gas injection/withdrawal wells pursuant to reasonable gas and oil industry standards, which call for such tests on each well at least every five (5) years;

n.  failing to remedy the corrosion identified in the inly Mechanical Integrity Test performed on the McCord Well in April 1995;

o.  failing to implement reasonable measures to prevent natural gas leaks, demonstrated by a November 2016 survey of 76 of the injection/withdrawal wells it operates at Manlove Field, wherein 12 wells, 16% of those studied, had leaks of natural gas at the surface level;

p.  failing to properly maintain a method for cathodic protection at the McCord Well by not having a proper amount of protective current;

q.  failing to properly maintain records required for an effective method of cathodic protection by not keeping records of cathodic protection groundbeds, timelines of their installation or any revisions thereto;

r.  failing to perform cathodic potential profile testing to determine levels of current on each well, including the McCord Well;

s.  failing to properly perform wall loss data logging to determine current state of the integrity of its wells;

t.  failing to have a corrosion monitoring program to track, trend and react to gas, liquid and corrosion rate sampling results and trends.

u.  misrepresenting the extent of the contamination and damage done to the Mahomet Aquifer System to area residents, government regulators or affected homeowners and farmers, including Plaintiffs and Class Members; and

v.  failing to properly assess or investigate the extent, location or amount of the contamination, or who was affected by the large release of contamination, even after it was made aware of the fact of the contamination and that it had spread to nearby water wells, and would spread in the future to additional water wells.

**3. Defendants conspired to misrepresent the extent of contamination in order to cover-up the catastrophe and the risks it posed and continues to pose to the public.**

117.    The Gas Defendants hired a public relations firm, Defendant Broydrick, to perform "crisis management," to deal directly with Plaintiffs and other affected homeowners in an effort to limit accurate and necessary information from becoming known to Plaintiffs and to the public at large.

118.    Defendants and Broydrick agreed to represent to class members that Anna Mareno ("Mareno") was an employee of WEC, even though she was an employee of Broydrick. Mareno was even given a WEC business card to hand out to class members:



119.    Mareno contacted dozens of class members under the guise of being a WEC employee who could offer the homeowners help. In reality, Mareno was contacting class members for the purpose of gathering intelligence on the class members and forestalling those class members from taking legal action.

120.    Examples of Mareno's interactions with homeowners - requested, facilitated, and approved by the Gas Defendants – follow:

121.    *Family A.* Mareno contacted homeowners "Mr. and Mrs. A" on multiple occasions in 2017 by phone and in person at their home. Mareno's task was to facilitate Peoples Gas' work on their well, which was contaminated by the natural gas leak, and to forestall litigation.

122.    On June 22, 2017, Mareno obtained Mr. And Mrs. A's agreement for Peoples Gas to place a gas/water separator system in their basement. Mareno handwrote an agreement, which was signed by Mr. & Mrs. A, and signed as follows by Mareno: "Anna Mareno / Peoples Gas".

123.    On October 6, 2017, in response to "real estate conversations" with Mr. A, Mareno called Mr. A. She reported to WEC that "[h]is tone appeared comfortable with me however he clearly stated until he knows more information he is not comfortable making any decisions regarding the well relief." Mareno indicated that Mr. A "might be more willing to work with us if the following concerns are addressed and explained to him stating the sooner the better."

124.    She listed questions that included the size of the leak and its longevity, as well as his concerns with "property values," about which he asked "What are the long-term ramifications of this to them as home owners?"

125.    On information and belief, Mareno reassured Mr. and Mrs. A that the leak would

be fully remediated by the Gas Defendants and would not affect property values.

126.     **Family B.** In another example, on July 13, 2017, Mareno spoke with Family B, whose well was infected by the natural gas leak. Family B advised Mareno that they preferred to have their own plumber depressurize and flush out the equipment installed by a Gas Defendants' contractor and agent, Willard McKinkley, being used to separate natural gas from their water.

127.     Approximately 10 days later, the contractor visited these homeowners and sampled the water. He followed up with Mareno via telephone, and told her that "there are still bubbles in the water" but that he had a conversation with the homeowners about "glacial gas verses[sic] natural gas," which reflects, on information and belief, the Gas Defendants' attempts to confuse homeowners about the cause of gas in their wells and cast blame on naturally-occurring gas, rather than the Mahomet gas leak.

128.     **Family C.** In another example, on October 3, 2017, Mareno spoke with Mr. C. Mr. C reported that his wife noticed bubbles from their kitchen faucet, and he had noticed that the water used for their cattle to drink was foaming. Mr. C reported that the young cattle refused to drink the water.

129.     Mareno apparently told Mr. C that the test results on their water showed that the gas was not from the McCord Well leak, but from a leak in 1963.

130.     **Family D and Family E.** In other examples, Mareno's job was to forestall homeowners from getting their test results before the Gas Defendants. For example, on October 30, 2017, Mareno spoke with Mrs. D who "was questioning where her water test results were *** I stated we would deliver as soon as we got some."

131.     Likewise, on Saturday, October 28, 2017, Mareno called Family E and spoke with Mrs. E. Mareno "[i]nformed her that her water test results showed primarily glacial gas with

some very small parts of thermogenic gas. (ours),″ and emphasized that the glacial gas was "typical of what every else has with a very small amount of ours in it –″. Mareno reassured Mrs. E that the natural gas "was not dangerous at all″. Mareno told Mrs. E that she would deliver the results to her on Monday.

132. Other families expressed concerns to Mareno about "property values,″ "cloudiness in water,″ "milky″ water, "nose bleeds,″ "rash[es],″ "long term health effects,″ the desire not to "hear the results from [Mareno], rather please mail the results″ directly to them, and concerns that they were not notified of the leak for 10 months.

133. After several lawsuits were filed on behalf of individual homeowners, the Gas Defendants instructed Mareno to "[v]isit those [homeowners] not with″ the plaintiffs' lawyers.

134. Defendants failed to provide affected homeowners, including Plaintiffs, with the laboratory gas analysis results on water samples taken from their homes, though it had promised it would do so.

135. Defendants failed to promptly inform affected homeowners, including some Plaintiffs, about the laboratory gas analysis results on water samples taken from their homes.

136. And Defendants misrepresented that tests reflecting natural gas in their water should be blamed on causes other than the Mahomet gas leak.

137. Defendants' misrepresentations continue today.

138. On February 25, 2022, Peoples Gas distributed a "Dear Neighbor″ letter to class members regarding the McCord Well leak. After describing certain but insufficient remediation efforts, the letter concluded: "With that said, it's important to remember that naturally occurring methane has been, and will continue to be, present in the aquifer. The natural gas we store is **no different** in terms of any health- or safety- related impact from the methane that is in the aquifer

naturally" (emphasis in original).

139.    Contrary to Defendants' representations however, the natural gas leaked from the McCord Well is different than the naturally occurring methane—and is in much larger and more dangerous quantities than in the Mahomet Aquifer before the leak.

**E.    Plaintiffs and the Class Members have been damaged.**

**1.    Like the Class Members, Plaintiffs receive their water from the Mahomet Aquifer and have been affected by the McCord Well gas leak.**

140.    The Pabst Family resides at 379 County Road 2700 N, Mahomet, Illinois.

141.    Peoples Gas retained a laboratory, Isotech, to test samples taken from the Pabst Family's well on at least six occasions, including on Oct. 11, 2017, July 24, 2018, March 11, 2019, Dec. 23, 2019, Sept. 15, 2021, and Nov. 17, 2021.

142.    On December 13, 2021, Isotech sent a letter to Peoples Gas, detailing the test results from the Pabst Family's property.

143.    According to Isotech, the Pabst Family's property "is next door to a property whose water well, in 2017, showed evidence of being affected by the McCord No. 2 gas storage well leak."

144.    The four tests of the Pabsts' well from 2017-19 reportedly reflected that their well had not been significantly impacted by the McCord Well natural gas leak.  These tests reportedly showed "low" amounts of "dissolved methane concentrations, from 1.8 to 2.6 mg/L methane."

145.    However, "[t]he results from the September 2021 [] sampling event showed that the dissolved gas in the well had been impacted by storage gas," and contained 9.3 mg/L methane. According to Isotech, the analytical results "showed a significant amount of methane present."

146.    Isotech's report concluded: "Thus, the two samples collected in 2021 from this

site indicates the water well has recently become impacted by storage gas, undoubtedly

associated with the McCord No. 2 well leakage."

### 2. The contaminated water is not safe and poses serious risk of harm.

147.   The natural gas stored at Manlove Field is composed predominantly of methane,

but also contains ethane, propane, iso-butane, n-butane, iso-pentane, n-pentane, and hexanes +.

148.   Methane is highly flammable and an asphyxiant in enclosed spaces.

149.   According to the U.S. Department of Interior, the risk of explosion due to

methane dissolved in water in a residential home is greatest in a shower or near a clothes

washing machine because explosion risk is increased in confined areas where water is exposed

and aerated in large volumes.

150.   As such, the U.S. Department of Interior has adopted the following

Recommended Action Levels for methane dissolved in water:

a.   **Immediate Action at 28 ppm or greater**: "A dissolved methane concentration greater than 28 mg/L indicates that potentially explosive or flammable quantities of the gas are being liberated in the well and/or may be liberated in confined areas of the home. This concentration of methane should result in immediate ventilation of the well head to the atmosphere. Additionally, methane concentration in excess of 28 mg/L may require further mitigation and modifications to the water supply system."

b.   **Warning, Investigate at 10 ppm or greater:** "When a dissolved methane concentration exceeds 10 mg/L, it should be viewed as a warning that gas is not only present but that the concentration may be increasing. Appropriate actions would be to warn the occupants. This warning should include information that the concentration of methane is above 10 mg/L, and that remediation may be prudent to reduce the methane concentration to less than 10 mg/L. Additionally, the warning should include a recommendation that ignition sources be removed from the immediate area."

151.   The storage stratum is a saltwater aquifer that is non-potable because it is

extremely high in sodium, chloride, magnesium, sulfate, iron, calcium, silica, hardness and

dissolved solids.

152.    At all times relevant to this suit, Plaintiffs and Class members relied upon well water drawn from wells located on their property for drinking water and other domestic uses, such as bathing, cooking, washing and appliance operation.

153.    Upon information and belief, the blow-out at the injection/withdrawal well owned and operated by Peoples Gas contaminated the Plaintiffs' drinking water, property, and soil with natural gas and non-potable saltwater, including all of the aforementioned contaminates contained therein.

154.    Laboratory testing has demonstrated that the Mahomet Aquifer System that services Plaintiffs' water wells, including in and around Plaintiffs' properties, has been contaminated with extremely high levels of methane, up to 92 ppm, in addition to ethane, propane, iso-butane, n-butane, iso-pentane, n-pentane and hexanes + due to the release of thermogenic gas from Manlove Field.

155.    On or about October 20, 2017, Peoples Gas was ordered by a Champaign County Circuit Court in an action brought by the Illinois Attorney General's Office to, "immediately distribute and continue to distribute on a regular basis bottled water to any and all households whose water supply has been impacted."

156.    Prior to the aforementioned court order, Peoples Gas had not supplied any bottled water to any Class members. Since the court order, Peoples Gas has not supplied all Class members with bottled water.

**3.  Plaintiffs and Class members have reported symptoms of contamination.**

157.    Multiple class members have reported problems with their water.

158.    Laboratory testing has demonstrated that the drinking water for many class members has been contaminated with methane and ethane. Importantly, natural gas is not static

and does not sit in one place in the aquifer. Thus, some class members' water tested for high levels of methane several years ago and some have tested for high levels of methane just recently.

159.    Class members have reported problems with the quality, taste, smell, and pressure of their drinking water as a result of the contamination.

### 4.  Defendants' misconduct has also caused Plaintiffs to suffer property damage and monetary losses.

160.    The property damages sustained by Plaintiffs and the Class fall into several categories. First, the Plaintiffs' pipes and appliances have corroded or will corrode, shortening their lifespan, and causing further damage when they break. Second, the value of Plaintiffs' real property has been substantially diminished as a result of the continuing questionable safety of water from the Mahomet Aquifer and existence of corroded pipes and appliances.

161.    The effect of corrosive water on residential and commercial piping and appliances is well understood. For example, a 2014 study by the Water Research Watershed Center stated: "[w]ith respect to the corrosion potential of YOUR drinking water, the primary concerns include the potential presence of TOXIC Metals, such as lead and copper; deterioration and damage to the household plumbing, and aesthetic problems such as: stained laundry, bitter taste, and greenish-blue stains around basins and drains."

162.    The Water Research Watershed Center has further explained that, "[t]he cost of corrosion can be expensive. Corrosion can impact you and your family's health, aesthetic quality of your water, waste money, and damage your household piping and fixtures."

163.    Not only does corrosion cause the "premature failure of household plumbing and plumbing fixtures," the Water Research Watershed Center has explained, corrosion also

"decreases the efficiency of hot water heaters and may cause premature failure to the heater."

164.    Corroded pipes not only present a continuing health threat, they risk further damage to one's property because corrosion can result in deep pits in the pipe or tank walls that can eventually break, causing substantial water damage to homes and businesses.

165.    Moreover, studies have shown that risk of water contamination is an important concern for prospective homeowners that is capitalized into property values. The prices of properties that are closer to a well associated with natural gas storage transact for tens of thousands of dollars less than those that are not associated with storage well activity or than those with access to public water.

166.    Here, the diminution in value to the properties of Plaintiffs and the Class is even greater because contamination of the Mahomet Aquifer has already occurred, and thus the likely contamination of the wells now or in the future is not speculative, but instead probable.

167.    In particular, Plaintiffs and the classes seek (i) monetary damages to compensate class members for the diminution in value of their property caused by Defendants' conduct; (ii) monetary damages to compensate class members for the loss of the use and enjoyment of their properties caused by Defendant's conduct; (iii) monetary damages to compensate class members for the loss of quality of life caused by Defendants' conduct.

168.    Further, because Defendants' acts were done maliciously, oppressively, deliberately, and in reckless disregard of Plaintiffs and the classes, Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future.

## CLASS ALLEGATIONS

169.    Plaintiffs bring this action both on behalf of themselves, and as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2), (b)(3), and/or (c)(4) on behalf of the

following Classes:

170.    The "Water Use Class" defined as "All persons who have lived or worked in the rural Mahomet, Illinois or Fisher, Illinois area during any period between October 28, 2015 and the present";

171.    The "Real Estate Class" defined as "All persons who have owned real property in rural Mahomet, Illinois or Fisher, Illinois area during any period between October 28, 2015 and the present"; and

172.    The "Real Estate Easement Subclass" defined as "All persons who own real property subject to a Gas Storage Grant – Oil and Gas Lease in rural Mahomet, Illinois or Fisher, Illinois area during any period between October 28, 2015 and the present."

173.    The Water Use Class, Real Estate Class and Real Estate Easement Subclass are collectively referred to as the "Class."

174.    Excluded from the Class are Defendants, all governmental entities, and any judges or justices assigned to hear any aspect of this action.

175.    Plaintiffs do not know the exact number of Class members at this time but expects that the Class members are ascertainable through Defendants' books and records and the books and records maintained by the Recorder of Deeds with the Champaign County Clerk.

176.    Plaintiffs reasonably believe that there are thousands of Class members, such that joinder of all Class members is impracticable. For example, Mahomet has a Village population of approximately 8,400 people and Fisher's population is approximately 2,000 people.

177.    Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs reside in rural Mahomet, Illinois, and their water recently tested positive for high levels of methane from the natural gas that leaked from the Manlove Field. All Class members were damaged by the

same wrongful conduct of Defendants as alleged herein, and the relief sought is common to the Class.

178.    Numerous questions of law or fact arise from Defendants' conduct that are common to the Class, including but not limited to:

a.    The nature of the misrepresentations made by Defendants;

b.    The nature of the omissions of material fact by Defendants;

c.    Whether Defendants engaged in a pattern of racketeering activity;

d.    Whether the Mahomet Aquifer Contamination Enterprise exists, and whether Defendants participated in the RICO enterprise;

e.    Whether Defendants' conduct herein violated 18 U.S.C. § 1962(c) of the Racketeer Influenced and Corrupt Organizations Act (RICO);

f.    Whether the Gas Defendants engaged in ultrahazardous activities subject to strict liability;

g.    Whether the Gas Defendants were negligent;

h.    Whether the Gas Defendants breached the Easement Agreements, and whether those agreements should be rescinded;

i.    Whether Plaintiff and the other members of the Class were injured by Defendants' conduct, and, if so, the appropriate class-wide measure of damages for Class members;

j.    Whether the damages are subject to trebling or an award of punitive damages is appropriate;

k.    The scope of any injunctive relief to which Plaintiff and the other members of the Class are entitled.

179.    These and other questions of law and fact are common to the Class and predominate over any questions affecting only individual Class members.

180.    Plaintiffs will fairly and adequately represent the interests of the Class in that they have no conflict with any other members of the Class. Furthermore, Plaintiffs have retained competent counsel experienced in class actions and other complex litigation.

181.    Defendants have acted on grounds generally applicable to the Class, thereby making final injunctive relief appropriate with respect to the Class as a whole.

182.    This class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy. Prosecution as a class action will eliminate the possibility of repetitive litigation. There will be no material difficulty in the management of this action as a class action.

183.    The prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

**TOLLING/ FRAUDULENT CONCEALMENT**

184.    Plaintiffs assert all applicable statutory and common law rights and theories related to the tolling or extension of any applicable statute of limitations, including equitable tolling, delayed discovery, discovery rule, and/or fraudulent concealment.

185.    The discovery rule applies to toll the running of the statute of limitations until Plaintiffs knew, or through the exercise of reasonable care and diligence should have known, of facts that Plaintiffs had been injured, the cause of the injury, and the tortious nature of the wrongdoing that caused the injury.

186.    The nature of Plaintiffs' injuries, damages, or their causal relationship to Defendants' conduct was not discovered, and through reasonable care and due diligence could

42

not have been discovered until a date within the applicable statute of limitations for filing Plaintiffs' claims.

187.    Plaintiffs bring this complaint within the applicable statute of limitations. Specifically, Plaintiffs bring this action within the prescribed time limits following Plaintiffs' awareness of their injury and Plaintiffs' knowledge of the wrongful cause.  Prior to such time, Plaintiffs did not know and had no reason to know of their injuries and/or the wrongful cause of those injuries.

188.    The running of the statute of limitations is tolled due to equitable tolling. Defendants are estopped from relying on any statutes of limitation or repose by virtue of their acts of fraudulent concealment, through affirmative misrepresentations and omissions to Plaintiffs and the public regarding the scope of the contamination, the remediation, the ongoing risks, and the likelihood of methane contamination of Plaintiffs' water.  Defendants affirmatively withheld and/or misrepresented facts concerning the safety of the water supply from the Mahomet Aquifer.  As a result of Defendants' misrepresentations and concealment, Plaintiffs were unaware, and could not have known or have learned through reasonable diligence, of facts related to Defendants' misrepresentations or omissions, that Plaintiffs had been exposed to the risks alleged herein, or that those risks were the direct and proximate result of the wrongful acts and/or omissions of Defendants.

189.    Given Defendants' affirmative actions of concealment by failing to disclose this known but non-public information about the scope of the natural gas leaks and contamination of the Mahomet Aquifer - information over which Defendants had exclusive control - and because Plaintiffs could not reasonably have known, Defendants are estopped from relying on any

statutes of limitations or repose that might otherwise be applicable to the claims asserted herein.

## CAUSES OF ACTION

## COUNT I – VIOLATON OF 18 USC § 1962(C)

190.    Plaintiffs repeat and re-allege paragraphs 1-189 of the Complaint as though fully set forth herein. Plaintiffs bring Count I individually and on behalf of the Water Use Class and Real Estate Class against all Defendants.

### 1.  The association in fact.

191.    Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation ofn18 U.S.C. § 1962(c).

192.    The Mahomet Aquifer Contamination Enterprise is an association-in-fact RICO enterprise within the meaning of 18 U.S.C. § 1961(4) consisting of WEC Energy Group, Peoples Gas, and Broydrick.

193.    The Defendant "persons" are distinct from the Mahomet Aquifer Contamination Enterprise.

194.    The Mahomet Aquifer Contamination Enterprise is open-ended and continuous.

### 2.  The common purpose.

195.    The Mahomet Aquifer Contamination Enterprise falls within the meaning of 18 U.S.C. § 1961(4) and consists of a group of "persons" associated together for the common purpose of: (i) covering up and misrepresenting the scope of the natural gas contamination of the Mahomet Aquifer; (ii) covering up and misrepresenting the risks of the natural gas contamination to the water supply of Plaintiffs and the Class into the future; (iii) covering up and misrepresenting the potential outcomes of Defendants' remediation efforts; and (iv) reducing or eliminating the Defendants' payment of damages to Plaintiffs and the Class as a result of the Gas

Defendants' negligence.

### 3. The roles of the participants.

196.     Each member of the Mahomet Aquifer Contamination Enterprise participated in the affairs of the enterprise by engaging in misrepresentations and omissions of material fact to cover up and misrepresent the scope of the natural gas contamination.

### 4. Pattern of racketeering and predicate acts.

197.     The Defendants have conducted and participated in the affairs of the Mahomet Aquifer Contamination Enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1) and 1961(5), which includes multiple instances of mail and wire fraud as described throughout and below.

198.     Defendants used the mails and wires for the transmission, delivery, or shipment of the following by the Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' scheme:

a.   Communications, including telephone calls, emails, texts, and messages between WEC and governmental entities concerning the blow-out and contamination; between Peoples Gas and governmental entities concerning the blow-out and contamination; between WEC, Peoples Gas, and Broydrick concerning the cover-up; and between Peoples Gas, Broydrick, and class members regarding the blow-out, contamination, test results, risks (or purported lack thereof), and remediation.

b.   Wires or checks reflecting the payment of money from WEC and/or Peoples Gas to Broydrick;

c.   Agreements between the Gas Defendants and Broydrick relating to the scope of the cover-up and their respective roles.

45

199.    Defendants utilized the interstate and mail and wires for the purpose of obtaining money or property by means of the omissions, false pretenses, and misrepresentations described therein.

200.    Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.

201.    Defendants also communicated by U.S. Mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, and other third-party entities in furtherance of the scheme.

### 5. Affected interstate commerce.

202.    The Mahomet Aquifer Contamination Enterprise engaged in and affected interstate commerce, because, *inter alia*, it procured natural gas from outside Illinois and transported it to Illinois to be stored in the Manlove Field, and it involved companies domesticated in Illinois and Wisconsin to carry out the cover up of the McCord Well blow out and contamination of the Mahomet Aquifer.

### 6. Operating and Management

203.    Defendants each exerted some measure of control over the Mahomet Aquifer Contamination Enterprise, and Defendants participated in the operation or management of the affairs of the Mahomet Aquifer Contamination Enterprise.

204.    Within the Mahomet Aquifer Contamination Enterprise, there was a common communication network by which co-conspirators shared information on a regular basis. The Mahomet Aquifer Contamination Enterprise used this common communication network for the purpose of covering up the scope and effects of the McCord Well blow-out and contamination of the Mahomet Aquifer, as well as the scope and results from the Gas Defendants' remediation

efforts, through misrepresentations and omissions of material fact.

205. Each participant in the Mahomet Aquifer Contamination Enterprise had a systematic linkage to each other participant through corporate ties, contractual relationships, financial ties, and the continuing coordination of their activities. Through the Mahomet Aquifer Contamination Enterprise, Defendants and their co-conspirators functioned as a continuing unit with the purpose of furthering the illegal scheme and their common purposes.

206. To achieve their common goals, Defendants hid from the general public the unlawfulness of their conduct and suppressed and/or ignored warnings from third parties regarding the legality of their conduct.

207. Defendants' scheme and the above-described racketeering activities amounted to a common course of conduct intended to hide and conceal the Gas Defendants' negligence with respect to the McCord Well, and to lull Plaintiffs and Class members into the belief that the contamination was limited, under control, and could be fully remediated. Each such racketeering activity was related, had similar purposes, involved the same or similar participants and methods of commission, and had similar results affecting similar victims, including Plaintiffs.

208. Defendants' fraudulent activities are part of their ongoing business and constitute a continuing threat to the property of the Class.

209. The pattern of racketeering activity alleged herein and each Defendant are separate and distinct from each other. Defendants engaged in a pattern of racketeering activity alleged herein for the purpose of conducting the affairs of the Mahomet Aquifer Contamination Enterprise.

### 7. RICO injury.

210. Plaintiffs have been injured in their property and business by reason of these violations in that their water has been contaminated by the natural gas, which Defendants

attempted to cover up both the risks of future contamination, need for testing, and actual contamination, as well as misrepresented the scope of the contamination.

211.    The injuries of Plaintiffs and the Class were directly and proximately caused by Defendants' racketeering activity, as described above.

212.    By virtue of these violations of 18 U.S.C. § 1962(c), Defendants are liable to Plaintiffs and Class members for three times the damages Plaintiffs have sustained, plus the cost of this suit, including reasonable attorneys' fees.

## COUNT II - VIOLATION OF 18 U.S.C. § 1962(D) (CONSPIRACY TO VIOLATE 18 U.S.C. § 1962(C))

213.    Plaintiffs repeat and re-allege paragraphs 1-189 of the Complaint as though fully set forth herein. Plaintiffs bring Count II individually and on behalf of the Water Use Class and Real Estate Class against all Defendants.

214.    Section 1962(d) of RICO provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b) or (c) of this section."

215.    Defendants have violated section 1962(d) by conspiring to violate 18 U.S.C. § 1962(c). The object of this conspiracy has been and is to conduct or participate in, directly or indirectly, the conduct of the affairs of the section 1962(c) Enterprise described previously through a pattern of racketeering activity.

216.    As demonstrated in detail above, Defendants' co-conspirators have engaged in numerous overt and predicate fraudulent racketeering acts in furtherance of the conspiracy, including multiple instances of mail and wire fraud.

217.    The nature of the above-described Defendants' co-conspirators' acts in furtherance of the conspiracy gives rise to an inference that they not only agreed to the objective of an 18 U.S.C. § 1962(d) violation of RICO by conspiring to violate 18 U.S.C. § 1962(c), but

48

also were aware that their ongoing fraudulent acts have been and are part of an overall pattern of racketeering activity. At all relevant times, all Defendants and their co-conspirators were aware of the essential nature and scope of the enterprise and intended to participate in it.

218.    As a direct and proximate result of Defendants' overt acts and predicate acts in furtherance of violating 18 U.S.C. § 1962(d) by conspiring to violate 18 U.S.C. § 1962(c), Plaintiffs and Class Members have been and are continuing to be injured in their business or property, as set forth more fully above.

219.    Defendants have sought to and have engaged in the violations of the above federal laws and the effects thereof detailed above are continuing and will continue unless injunctive relief prohibiting Defendants' illegal acts constituting a pattern of racketeering activity is fashioned and imposed by the Court.

### COUNT III – NEGLIGENCE

220.    Plaintiffs repeat and re-allege paragraphs 1-189 of the Complaint as though fully set forth herein. Plaintiffs bring Count III individually and on behalf of the Water Use Class and Real Estate Class against the Gas Defendants.

221.    As a result of the aforementioned negligent acts and/or omissions, the drinking water for Plaintiffs and the Class members has been highly contaminated with natural gas, non-potable saltwater and/or other chemical compounds and pollutants.

222.    As a result of the aforementioned negligent acts and/or omissions, on or about October 28, 2015, there was a sudden, calamitous and/or dangerous event, a blow-out, that caused physical harm and property damage to Plaintiffs and the Class Members, as well as ongoing and likelihood of harm and property damage.

223.    As a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions of the Gas Defendants, Plaintiffs and the Class members have suffered and

will continue to suffer injury to their person through the ingestion of the aforementioned offensive and harmful gases and fluids defined as "contaminants" by the Illinois Environmental Protection Agency.

224.    As a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions of the Gas Defendants, Plaintiffs and the Class members have suffered and will continue to suffer physical injury to their property, including the aforementioned contamination of their drinking water, contamination of their soil and landscape, physical damage to their water well system and physical damage to their plumbing.

225.    As a direct and proximate result of one or more of the aforementioned negligent acts and/or omissions of the Gas Defendants, Plaintiffs and the Class members have suffered and will continue to suffer diminution of value of their property.

## COUNT IV – STRICT LIABILITY FOR ULTRA-HAZARDOUS ACTIVITY (STORAGE)

226.    Plaintiffs repeat and re-allege paragraphs 1-189 of the Complaint as though fully set forth herein. Plaintiffs bring Count IV individually and on behalf of the Water Use Class and Real Estate Class against the Gas Defendants.

227.    The Gas Defendants engaged in an ultra-hazardous activity by owning, constructing, operating, managing and maintaining Manlove Field, a facility storing large amounts of flammable and explosive hazardous gases, chemicals, pollutants and contaminants in a natural formation approximately 4,000 feet below the Mahomet Aquifer System, which supplies fresh drinking water to approximately 850,000 people, including Plaintiffs and Class members.

228.    The business of the Gas Defendants includes storing, receiving and providing natural gas, hazardous gases, chemicals, pollutants and other contaminants, and, thus, is

inherently and unavoidably dangerous in that its very nature involves a high degree of risk of harm to others due to its flammable, toxic and repulsive qualities.

229. The storage of billions of cubic feet of natural gas approximately 4,000 feet below a freshwater supply serving approximately 850,000 people using approximately 153 injection/withdrawal wells is not a common activity.

230. It is not appropriate to store billions of cubic feet of natural gas below a freshwater supply serving approximately 850,000 people, nor below land occupied for residential living.

231. There is no value at all to Plaintiffs and the Class members, nor to their community, in the storage of billions of cubic feet of natural gas below their properties and their freshwater supply by the Gas Defendants because all of said natural gas is sold elsewhere and none is used to service their community.

232. The Gas Defendants' engagement in the aforementioned ultrahazardous activity caused the McCord Well blow-out, and as a result the drinking water for Plaintiffs and the Class Members has been highly contaminated with natural gas, non-potable saltwater and/or other chemical compounds and pollutants.

233. The aforementioned blow-out occurred on or about October 28, 2015, and was a sudden, calamitous and/or dangerous event that caused physical harm and property damage to Plaintiffs and the Class members.

234. As a direct and proximate result of engagement in the aforementioned ultrahazardous activity by the Gas Defendants, Plaintiffs and the Class members have suffered and will continue to suffer injury to their persons through the ingestion of the aforementioned offensive and harmful gases and fluids defined as "contaminants" by the Illinois Environmental

Protection Agency.

235.     As a direct and proximate result of engagement in the aforementioned ultrahazardous activity by the Gas Defendants, Plaintiffs and the Class members have suffered and will continue to suffer physical injury to their property, including the aforementioned contamination of their drinking water, contamination of their soil and landscape, physical damage to their water well system and physical damage to their plumbing.

236.     As a direct and proximate result of one or more of the aforementioned ultrahazardous activities by the Gas Defendants, Plaintiffs and the Class members have suffered and will continue to suffer diminution of value of their property.

## COUNT V – STRICT LIABILITY FOR ULTRAHAZARDOUS ACTIVITY (FAILURE TO MAINTAIN MECHANICAL INTEGRITY)

237.     Plaintiffs repeat and re-allege paragraphs 1-189 of the Complaint as though fully set forth herein. Plaintiffs bring Count V individually and on behalf of the Water Use Class and Real Estate Class against the Gas Defendants.

238.     The Gas Defendants knew or should have known that storing and distributing natural gas through aged, deteriorated and unmaintained pipes and storage facilities that were overdue for inspection and repair would inevitably leak, as other similar facilities had previously leaked, and would create actual harm to the persons in the communities in the vicinity of the McCord Well.

239.     The Gas Defendants knew or should have known that the chemicals in the wells associated with Manlove Field, including methane, ethane, propane, n-butane, hydrogen sulfide, benzene and radon, which are known human carcinogens, are the types of chemicals that if they are released in the air in the environment, they cannot be made reasonably safe and will result in a toxic contamination exposing persons to a serious risk of harm to their health, and the act of

exposing persons to that risk for the sole reason that Defendants chose not to maintain the condition of their wells, or even warn plaintiffs who were in the vicinity of the risk of exposure because Defendants were consciously choosing not to maintain their wells is an ultrahazardous activity because it cannot be made safe through the exercise of reasonable care.

240.    The Gas Defendants were engaged in ultrahazardous activities by storing, transporting and retrieving natural gas in a manner which necessitated the accumulation and potential release of noxious and toxic fumes and chemicals, some of which were known carcinogens. As such, the high risk of harm to the community outweighed any benefits to the community arising out of defendants' activities.

241.    As a direct and legal result of the storage and distribution of natural gas and other toxic substances by Defendants in aged, deteriorated and unmaintained pipes and storage facilities that were overdue for inspection and repair, and would inevitably be leaking, the Gas Defendants caused noxious and toxic fumes, gases, and chemicals to escape from the McCord Well and inundated the surrounding community causing harm to Plaintiffs and the Class members as described herein.

242.    The harm to Plaintiffs and the Class members was and is the kind of harm that would reasonably be anticipated as a result of the risks created by the kind of activities engaged in by the Gas Defendants in close proximity to residential areas.

243.    The Gas Defendants are liable to Plaintiffs for all damages arising from this ultrahazardous activity.

**COUNT VI – PRIVATE NUISANCE**

244.    Plaintiffs repeat and re-allege paragraphs 1-189 of the Complaint as though fully set forth herein. Plaintiffs bring Count VI individually and on behalf of the Real Estate Class

against the Gas Defendants.

245.    The aforementioned past, present, and continuing contamination by the Gas

Defendants of the soil, air and groundwater on the property owned and occupied by the Plaintiffs

and the Class members is a private nuisance because:

      a.   It constitutes an unreasonable and substantial invasion of their interest in the use and enjoyment of their land;

      b.   It is offensive physically to their senses and makes their life uncomfortable; and/or

      c.   It is in defiance of the aforementioned State laws and regulations and defined as a public nuisance in the Illinois Criminal Code.

246.    The aforementioned past, present and continuing contamination by the Gas

Defendants of the soil, air, and groundwater on the property owned and occupied by Plaintiffs

and the Class members is not a temporary violation, but ongoing, continuing, and likely

permanent or nearly permanent.

247.    Plaintiffs and the Class members have been damaged as a direct and/or

consequential result of the aforementioned nuisance by the Gas Defendants as follows:

      a.   Deprivation of the use and enjoyment of their home and property;

      b.   Discomfort from having consumed, bathed in, washed clothes with and otherwise done all domestic activities with water containing the aforementioned offensive and harmful gases and fluids;

      c.   Discomfort from the inhalation of the aforementioned offensive and harmful gases;

      d.   Discomfort from the unreasonable risk of explosion created by the accumulation of combustible gas in their home;

      e.   Injury to their person through the ingestion of the aforementioned offensive and harmful gases and fluids;

      f.   Increased risk of injury to their person created, or likely to be created, through the ingestion of the aforementioned offensive and harmful gases and fluids;

      g.   Physical injury to their property, including the aforementioned contamination of their drinking water, contamination of their soil and landscape, physical damage to their water well system and physical damage to their plumbing;

h. Physical invasion to their property, including the aforementioned physical invasion to their drinking water and physical invasion to their soil and landscape; and/or

i. Diminution of value of their property.

248. The aforementioned acts and/or omissions of the Gas Defendants, both in creating the nuisance and then subsequently in responding to it, constituted fraud, actual malice, and/or deliberate violence or oppression to others, including Plaintiffs and the Class members, and warrant an award of punitive damages.

249. The aforementioned acts and/or omissions of the Gas Defendants, both in creating the nuisance and then subsequently in responding to it, were willful and/or with such gross negligence as to indicate a wanton disregard of the rights of others, including the Plaintiffs and Class members, and warrant an award of punitive damages.

## COUNT VII – TRESPASS

250. Plaintiffs repeat and re-allege paragraphs 1-189 of the Complaint as though fully set forth herein. Plaintiffs bring Count VII individually and on behalf of the Real Estate Class against the Gas Defendants.

251. Plaintiffs and Real Estate Class Members are owners of real property with the right of possession.

252. The Gas Defendants negligently, recklessly, and/or intentionally failed to properly control the natural gas stored in Manlove Field, such that the Gas Defendants proximately caused natural gas and related contaminants to enter, invade, intrude upon and injure the right of Plaintiffs and the Class to possess their property.

253. Plaintiffs and the Class have not consented, and do not consent, to the contamination alleged herein. The Gas Defendants knew or reasonably should have known that

Plaintiffs and the Class would not consent to this trespass.

254.    This trespass to land continues to this day and is likely to continue into the future.

255.    As a direct and proximate result of the Gas Defendants' acts and omissions, the drinking water of Plaintiffs and the Class has been contaminated with natural gas, causing significant property damage, including actual, consequential, and nominal damages.

256.    The aforementioned acts and/or omissions of the Gas Defendants, both in creating the trespass and then subsequently in responding to it, constituted fraud, actual malice, and/or deliberate violence or oppression to others, including Plaintiffs and the Class members, and warrant an award of punitive damages.

257.    The aforementioned acts and/or omissions of the Gas Defendants, both in creating the trespass and then subsequently in responding to it, were willful and/or with such gross negligence as to indicate a wanton disregard of the rights of others, including Plaintiffs and the Class members, and warrant an award of punitive damages.

**COUNT VIII – BREACH OF CONTRACT**

258.    Plaintiffs repeat and re-allege paragraphs 1-189 of the Complaint as though fully set forth herein. Plaintiffs bring Count VIII individually and on behalf of the Real Estate Easement Subclass against Peoples Gas.

259.    Documents titled Gas Storage Grant - Oil and Gas Lease were recorded with the Champaign County Recorder between Peoples Gas and the predecessors in title of the property now owned by Plaintiffs and the Class members.

260.    The terms and conditions of the aforementioned Gas Storage Grant - Oil and Gas Leases continue to be binding on both Peoples Gas and Plaintiffs and the Class members.

261.    Peoples Gas continues to enforce the provisions of the aforementioned Gas Storage Grant - Oil and Gas Leases in regard to the rights of Plaintiffs and the Class members,

namely through the exercise of the continued use of easements on their property with gas pipelines and/or subsurface gas storage.

262.    Peoples Gas has breached the terms of the aforementioned Gas Storage Grant - Oil and Gas Leases through the release of natural gas, non-potable saltwater and/or other chemical compounds and pollutants into the freshwater supply on the property owned by Plaintiffs and the Class members and upon which Peoples Gas owns, maintains and operates gas pipelines and/or stores gas.

263.    Peoples Gas has breached the terms of the aforementioned Gas Storage Grant - Oil and Gas Lease by failing to use due care to protect the freshwater supply on the property owned by Plaintiffs and the Class members and upon which Peoples Gas owns, maintains and operates gas pipelines and/or stores gas.

264.    Peoples Gas has breached the terms of the aforementioned Gas Storage Grant - Oil and Gas Lease by failing to provide Plaintiffs and the Class members with an alternative source of freshwater for domestic and agricultural use following its contamination of their freshwater source.

265.    Plaintiffs and the Class members are entitled to recover from Peoples Gas for all damages reasonably foreseeable and arising from Peoples Gas' breach of its contractually required duty of care.

266.    Plaintiffs and the Class members have been damaged as a direct and/or consequential result of the aforementioned breach of contract by Peoples Gas as follows:

   a.  Deprivation of the use and enjoyment of their home;

   b.  Discomfort from having consumed, bathed in, washed clothes with and otherwise done all domestic activities with water containing the aforementioned offensive and harmful gases and fluids;

   c.  Discomfort from the inhalation of the aforementioned offensive and harmful gases;

57

d.  Discomfort from the unreasonable risk of explosion created by the accumulation of combustible gas in their home;

e.  Injury to their person through the ingestion of the aforementioned offensive and harmful gases and fluids;

f.  Increased risk of injury to their person created, or likely to be created, through the ingestion of the aforementioned offensive and harmful gases and fluids;

g.  Physical injury to their property, including the aforementioned contamination of their drinking water, contamination of their soil and landscape, physical damage to their water well system and physical damage to their plumbing;

h.  Physical invasion to their property, including the aforementioned physical invasion to their drinking water and physical invasion to their soil and landscape; and/or

i.  Diminution of value of their property.

## COUNT IX – RESCISSION OF CONTRACT

267.  Plaintiffs repeat and re-allege paragraphs 1-189 of the Complaint as though fully set forth herein. Plaintiffs bring Count IX individually and on behalf of the Real Estate Easement Subclass against Peoples Gas.

268.  The aforementioned breach of contract by Peoples Gas was a material breach of the terms of the contract.

269.  Alternatively to the relief requested in Count VIII, Plaintiffs and the Class members seek rescission of the aforementioned contract.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against the Defendants, as follows:

A.  an order certifying the proposed Classes and Subclass, designating Plaintiffs as the named representatives of the Classes and Subclass, and designating the undersigned as Class Counsel;

B.  a declaration that Defendants acted with negligence, gross negligence, and/or willful,

wanton, and careless disregard for the health, safety, and property of Plaintiffs and members of the Class;

C. an award to Plaintiffs and Class members of compensatory, exemplary, and consequential damages, including interest, in an amount to be proven at trial;

D. an award of attorneys' fees and costs, as permitted by law;

E. an award of pre-judgment and post-judgment interest, as provided by law; and

F. such other relief as may be appropriate under the circumstances and/or permitted by law or as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury of any and all issues in this action so triable of right.

Dated: March 3, 2022                          BY:      */s/ Elizabeth A. Fegan*

> Elizabeth A. Fegan
> beth@feganscott.com
> Megan E. Shannon
> megan@feganscott.com
> FEGAN SCOTT LLC
> 150 S. Wacker Dr., 24th Floor
> Chicago, IL 60601
> (312) 741-1019
>
> James D. Spiros
> jspiros@spiroslaw.com
> Miranda Soucie
> msoucie@spiroslaw.com
> SPIROS LAW, P.C.
> 2807 N. Vermilion St., Suite 3
> Danville, IL 61832
> Telephone: 217.443.4343