## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| WESLY PABST and KATHERINE PABST, individually and on behalf of all others similarly situated, | |
| Plaintiffs, | Case No. 22-CV-01124 |
| v. | |
| THE PEOPLES GAS LIGHT AND COKE COMPANY, WEC ENERGY GROUP INC., and THE BROYDRICK GROUP, LLC, | Judge John Robert Blakey |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In a First Amended Class Action Complaint, Plaintiffs Wesley Pabst and Katherine Pabst, on behalf of themselves and all others similarly situated (collectively, "Plaintiffs") bring this putative class action against The Peoples Gas Light & Coke Company ("Peoples Gas"), WEC Energy Company ("WEC"), and The Broydrick Group ("Broydrick"), collectively (the "Defendants"). Plaintiffs allege that Peoples Gas and WEC caused a public crisis by exposing Plaintiffs and their property to water contaminated by natural gas, and that the Defendants exacerbated the crisis by concealing and misrepresenting its scope through the "Mahomet Aquifer Contamination Enterprise." [53] ¶¶ 5–6. Plaintiffs bring causes of action against all Defendants for violation of the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*. (Count I), and conspiracy to violate RICO (Count

II).  Plaintiffs also assert state law causes of action against WEC and Peoples Gas (Counts III—IX).  *Id.*

Defendants move to dismiss all claims, except for the negligence claims (Counts III, VI, and VII) against Peoples Gas, only.  [59].  For the reasons explained below, this Court grants in part, and denies in part, Defendants' motion.

## I.    Factual Allegations[1]

Underneath fifteen counties in east-central Illinois sits the Mahomet Aquifer. Equivalent to an underground river, the Mahomet Aquifer is the most important groundwater resource in the region, providing the area with approximately 220 million gallons of water per day.  [53] ¶¶ 16–20.

Defendant Peoples Gas, an Illinois natural gas provider, owns and operates Manlove Natural Gas Storage Field ("Manlove Field"), a natural gas storage area in Champaign County, Illinois that sits thousands of feet below the Mahomet Aquifer. *Id.* ¶¶ 35–36.  Manlove Field underlies approximately 27,500 acres of land.  *Id.* ¶ 36. As part of its natural gas operation, Peoples Gas injects and withdraws natural gas from Manlove Field through injection/withdrawal wells it owns and operates, along with miles of associated interconnected pipelines.  *Id.* ¶¶ 40, 43.  Many of such wells are located on or under privately-owned residential and agricultural property.  *Id.* ¶ 43.  As a result, Peoples Gas also has longstanding Easement Agreements with area landowners, including the Plaintiffs here, which give Peoples Gas the right to store

---

[1] The Court draws the facts from the Complaint, which it takes as true for purposes of the motion to dismiss.  *Killingsworth v. HSBC Bank Nevada*, 507 F.3d 614, 618 (7th Cir. 2017).

and remove natural gas in the reservoirs of Manlove Field that extend underneath the landowners' property. *Id.* ¶¶ 44–50.

This lawsuit relates to events at one of Manlove Field's wells, the L. McCord No. 2 ("McCord Well"), which has been in place since 1977 and was constructed with bare, unprotected steel. *Id.* ¶¶ 51, 58. EPA rules require operators and owners of injection/withdrawal wells to perform Mechanical Integrity Tests to ensure "that there is no movement of fluids into or between underground sources of drinking water (USDWs) associated with injection wells." *Id.*¶ 53. In April 1995, Peoples Gas performed its only Mechanical Integrity Test of McCord Well. *Id.* ¶ 56. The 1995 Test showed "significant corrosion, with up to 33% metal loss at certain points in the steel piping." *Id.* ¶ 57. Notwithstanding these findings, Peoples Gas never performed another Mechanical Integrity Test. *Id.* ¶¶ 58–60.

At some point after 1995, corrosion created holes "at the deep and middle locations" of the McCord Well, through which natural gas and corrosive saltwater began to leak into the well's shallower casings. *Id.* ¶ 63. In turn, the leaking natural gas and corrosive saltwater caused pressure to build up around the shallower casings and started to corrode it. *Id.* ¶¶ 63–64. Then around October 28, 2015, the shallower casings burst in places, forcing so much natural gas and saltwater into the Mahomet Aquifer System that the aquifer's water level increased by 50 feet. *Id.* ¶ 72. Following the "blow-out," natural gas and saltwater contamination continued to leak into the Mahomet Aquifer System (ostensibly undetected by anyone). *Id.* ¶ 68.

Over a year later, on December 6, 2016, Peoples Gas discovered gas bubble contamination in a water puddle at the surface near McCord Well. *Id.* ¶ 70. Peoples Gas performed tests on the well, revealing multiple "failure locations along the metal piping of the well." *Id.* ¶ 73. Shortly after, Peoples Gas removed the corroded pipes. *Id.* ¶ 74.

On December 16, 2016, employees for Peoples Gas' parent company, Defendant WEC issued an oral Hazardous Metal Incident Report to the Illinois Emergency Management Agency's hotline and made an oral "Hazardous Materials Incident Report" along with multiple statements to the Illinois EPA. *Id.* ¶¶ 75, 83. According to Plaintiffs, these statements contained multiple misrepresentations about the nature, scope, and cause of the leaks. *Id.* ¶¶ 76, 78.

Then, on December 19, 2016, Peoples Gas and WEC also tested one nearby residential well, which showed that natural gas had contaminated the well's water. *Id.* ¶¶ 79–81. Despite these findings, it did not test other wells or disclose this well water contamination to any government agency, nearby residents, or the public. *Id.* ¶¶ 82, 86–88.

Over the next few months, Peoples Gas continued to receive notice that natural gas had contaminated other residential water wells, but it failed to properly report or remedy the harm. *Id.* ¶¶ 86–89. Despite actual notice, it did not disclose the well contamination to any government agency or other residents. *See id.* To the contrary, Peoples Gas and WEC employees filed additional government reports that misrepresented the scale and cause of the natural gas leak, where it discovered the

leak, and the extent of water contamination. *Id.* ¶¶ 83–85. In addition, for several months beginning in December 2016, and without seeking air or water disposal permits or notifying government regulators, Peoples Gas vented approximately one million cubic feet of gas from the McCord Well. *Id.* ¶¶ 112–113.

At some point, Peoples Gas and WEC hired a public relations firm, Defendant Broydrick, to help "limit accurate and necessary information from becoming known to Plaintiffs and to the public at large." *Id.* ¶ 134. Defendants agreed that a Broydrick employee, Anna Mareno, would contact local homeowners and attempt to forestall them from taking legal action under the guise of helping them investigate possible well contamination. *Id.* ¶¶ 135–136.

Throughout 2017, Mareno, assisted by others at Peoples Gas and WEC, allegedly contacted dozens of homeowners by phone and in person and, among other things: (1) misrepresented that Peoples Gas and WEC would remediate the leak and it would not affect property values; (2) claimed that natural phenomena caused the gas in their wells; (3) withheld testing results; (4) claimed that the gas was not dangerous; and (5) obtained written agreements to install gas/water separators in homes. *Id.* ¶¶ 134–156. After some of these homeowners filed lawsuits against Peoples Gas in state court in 2017, Peoples Gas and WEC also instructed Mareno to talk to those represented homeowners without their attorneys present. *Id.* ¶ 150.

Finally, in September 2017, after some residents informed state regulators about the extent of the contamination and damage, the Illinois Department of Natural Resources (IDNR) issued a Notice of Violation against Peoples Gas and

ordered it to remediate the contamination and damage. *Id.* ¶ 115. In October 2017, the Illinois Attorney General also filed a lawsuit against Peoples Gas for violating various state statutes and regulations. *Id.* ¶ 157. The suit resulted in interim agreed orders in 2017 and 2019, and a Final Consent Order on June 27, 2022 that requires Peoples Gas to, among other things: (1) provide affected homeowners with bottled water and gas detectors; (2) offer to install gas/water separators and conduct comprehensive inspections of Manlove Field's wells; and (4) provide relief wells and implement a Groundwater Management Zone to monitor well water contamination. [53-7].[2]

Following the legal developments in the state cases, Plaintiffs filed their lawsuit in this Court on March 3, 2022. *See* [1]. On May 3, 2022, Defendants filed a motion to dismiss, [21] and this Court held oral argument on Defendants' motion on April 14, 2023. [51]. Based upon Plaintiffs' representations at the hearing that they needed to amend their original complaint, this Court denied Defendants' motion to dismiss without prejudice, and gave leave to amend. [50].

Plaintiffs filed their First Amended Class Action Complaint, ("the Complaint") on May 15, 2023, suing Peoples Gas, WEC, and Broydrick for substantive RICO violations (Count I) and RICO Conspiracy (Count II), 18 U.S.C. §§ 1964(c) & 1962(d). [53]. Plaintiff also sue Peoples Gas and WEC for negligence (Count III), strict liability (Counts IV and V); private nuisance (Count VI) and trespass (Count VII). *Id.* Plaintiffs sue only Peoples Gas for breach of contract (Count VIII) and

---

[2] Plaintiffs attached the filed Final Consent Order to their amended complaint. [53-7].

Rescission of Contract claims (Count IX), with respect to the Easement Agreements. *Id.* Defendants now move to dismiss all counts against Broydrick (Counts I and II) and WEC (Counts I through VII), and certain counts directed against Peoples Gas (Counts I, II, IV, V, VIII and IX), with prejudice.

For the reasons set forth below, this Court grants in part, and denies in part, Defendants' motion.

## II. Applicable Legal Standards

### A. Rule 12(b)(6) Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Santana v. Cook Cty. Bd. of Review*, 679 F.3d 614, 621 (7th Cir. 2012) (quoting *Iqbal*, 556 U.S. at 678).

In evaluating a complaint on a Rule 12(b)(6) motion, this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in Plaintiffs' favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept legal conclusions as true.

*Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). On a motion to dismiss, this Court may consider the complaint itself, documents attached to the complaint, documents central to the complaint and to which the complaint refers, and information properly subject to judicial notice. *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

### B. Rule 9(b) Standard

Claims alleging fraud must also meet Federal Rule of Civil Procedure 9(b) 9(b)'s heightened pleading requirements. Rule 9(b) requires pleadings to contain a level of specificity that is not typically required when evaluating the sufficiency of a complaint. *Thomson v. Washington*, 362 F.3d 969, 971 (7th Cir. 2004). As to the fraud portions contained within the RICO claims, Rule 9(b) demands that claimants "state with particularity the circumstances constituting fraud." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. Walgreen Co.*, 631 F.3d 436, 441–42 (7th Cir. 2011). Particularity requires that plaintiffs "describe the 'who, what, when, where, and how' of the fraud—'the first paragraph of any newspaper story.'" *Id.* (quoting *United States ex rel. Lusby v. Rolls–Royce Corp.,* 570 F.3d 849, 854 (7th Cir. 2009)). Although different cases require different levels of detail for a complaint to satisfy Rule 9(b), plaintiffs must provide "precision and some measure of substantiation," *United States ex rel. Presser v. Acacia Mental Health Clinic, LLC*, 836 F.3d 770, 776 (7th Cir. 2016) (citing *Pirelli*, 631 F.3d at 442).

### III. Discussion and Analysis

### A. Plaintiffs' RICO Claims

RICO permits private civil plaintiffs to sue under § 1964(c) for injuries to "business or property" caused "by reason of a violation of section 1962." 18 U.S.C. § 1964(c). Here, Plaintiffs allege both a substantive RICO violation under § 1962(c) (Count I) and a RICO conspiracy violation under § 1962(d) (Count II). This Court considers Plaintiffs' substantive RICO claim first.

#### i. Count I: Substantive RICO

Section 1962(c) makes it unlawful for any "person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of an unlawful debt." 18 U.S.C. § 1962(c); *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 265–68 (1992). To establish a violation of § 1962(c), Plaintiffs here must allege: (1) conduct; (2) of an enterprise; (3) through a pattern of racketeering activity. *Muskegan Hotels, LLC v. Patel*, 986 F.3d 692, 698 (7th Cir. 2021). In this case, Defendants challenge all three elements. *See* [60] at 5–20. In addition, Defendants contend that Plaintiffs have failed to adequately allege a RICO injury caused "by reason of a violation of section 1962." *Id.* As discussed below, Plaintiffs have failed to adequately plead all the elements of their substantive RICO claim. Therefore, the Court grants Defendants' motion with respect to Count I of Plaintiffs' Complaint, alleging violations of § 1962(c), without prejudice.

### a. Enterprise

A RICO complaint must identify the "enterprise." *See Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640, 644 (7th Cir. 1995). In their motion to dismiss, Defendants argue that Plaintiffs have failed to plead an enterprise that complies with the distinctiveness requirements of the statute. [60] at 12–13. In Count I, Plaintiffs identify Broydrick's employee, Anna Mareno, as the only RICO "person" and an "association-in-fact" enterprise comprised of WEC, Peoples Gas, and Broydrick. [53] ¶¶ 222–23. In the amended version of the complaint, Mareno is not named as a member of the alleged "association-in-fact" enterprise. *See id.*

To hold a person liable for a RICO violation, a plaintiff must plausibly allege that the RICO "person" has a separate and distinct existence from the RICO "enterprise."[3] This "distinctiveness" requirement stems from the language of § 1962(c), which makes it unlawful for "any *person* employed by or associated with any *enterprise* . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c) (emphasis added). RICO defines "enterprise" broadly to include "any individual,

---

[3] The requirement for the RICO person to "be separate and distinct" from the RICO enterprise for § 1962(c) actions is well-settled law. *See Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639,* 883 F.2d 132, 139 (D.C. Cir. 1989), *rev'd in part on other grounds,* 913 F.2d 948 (D.C. Cir. 1990); *Puckett v. Tenn. Eastman Co.,* 889 F.2d 1481, 1489 (6th Cir. 1989); *Garbade v. Great Divide Mining and Milling Corp.,* 831 F.2d 212, 213 (10th Cir. 1987); *Bishop v. Corbitt Marine Ways, Inc.,* 802 F.2d 122, 122 (5th Cir. 1986); *Schofield v. First Commodity Corp.,* 793 F.2d 28, 29 (1st Cir. 1986); *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 315 (2d Cir. 1985); *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 263 (3d Cir. 1995); *Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago,* 747 F.2d 384, 400 (7th Cir.1984), *aff'd on other grounds,* 473 U.S. 606 (1985); *Rae v. Union Bank,* 725 F.2d 478, 481 (9th Cir.1984); *United States v. Computer Scis. Corp.,* 689 F.2d 1181, 1190 (4th Cir. 1982), *overruled in part, Busby v. Crown Supply, Inc.,* 896 F.2d 833 (4th Cir. 1990); *Bennett v. Berg,* 685 F.2d 1053, 1061 (8th Cir. 1982); *United States v. Goldin Indus., Inc.,* 219 F.3d 1268, 1270 (11th Cir. 2000).

partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Bible v. United Student Aid Funds*, 799 F.3d 633, 655 (7th Cir. 2015) (citing 18 U.S.C. 1961(4)).

As relevant here, a RICO claim using an "association-in-fact" enterprise theory must allege that the association-in-fact "enterprise" and the "person" (employed by or associated with it as part of the RICO violation) are sufficiently distinct. *See Crichton v. Golden Rule Ins. Co.,* 576 F.3d 392, 398 (7th Cir. 2009) (citing *Haroco, Inc. v. Am. Nat'l Bank & Trust Co. of Chi.,* 747 F.2d 384, 401–02 (7th Cir. 1984)); *see also Bible*, 799 F.3d at 655 ("But the definition does require that the defendant be a 'person' that is distinct from the RICO enterprise."). Thus, to state a valid RICO claim under the theory alleged here, Plaintiffs must identify: (1) the "person" or "persons" it seeks to hold accountable under RICO; and (2) a distinct associated-in-fact "enterprise," that is not simply the same "person" or "persons" "referred to by a different name." *Cedric Kushner Promotions, Ltd. v. King,* 533 U.S. 158, 161 (2001); *Crichton*, 576 F.3d at 398. This matters because RICO liability depends on showing, among other things, that "the defendants conducted or participated in the conduct of the *'enterprise's* affairs,' not just their *own* affairs." *Reves v. Ernst & Young,* 507 U.S. 170, 185 (1993) (emphasis in original).

In Plaintiffs' original complaint, Plaintiffs failed to properly plead the features of a sufficiently distinct RICO "enterprise," conceding so at oral argument held on April 14, 2023. *See* [51] at 13:22–14:18. Plaintiffs' original complaint identified WEC, Peoples Gas, and Broydrick as the "persons" who allegedly violated section 1962(c),

and as the sole constituents of the "association-in-fact" enterprise, and further alleged that WEC was the parent company of Peoples Gas and that it had hired Broydrick solely as its agent to conduct its public relations. *See* [1] ¶ 11, 117. But it failed to allege any RICO roles, purposes, or relationships, beyond those inherent within the corporate relationship between the company, its subsidiary entity, and its corporate agent. *See* [51] at 10:20–22, 13:12–20; *see also Bible*, 799 F.3d at 655 (distinguishing a "run-of-the-mill commercial relationship" and a "truly joint enterprise where each individual entity acts in concert with the others to pursue a common interest"). As a result, this Court denied Defendants' motion to dismiss [21] without prejudice, to afford Plaintiffs the opportunity to correct various deficiencies of their original complaint.

In an apparent effort to remedy its prior "enterprise-person" issue, however, Plaintiffs took a step backwards in the new complaint. Plaintiffs' Amended Complaint now identifies Mareno, a non-defendant in this case, as the purported "person" violating § 1962(c), and again names WEC, Peoples Gas, and Brodyrick as the entities comprising the association-in-fact, *i.e.,* the "Mahomet Aquifer Contamination Enterprise." [53] ¶¶ 222–24. Plaintiffs also now allege that Anna Mareno is "distinct from the Mahomet Aquifer Contamination Enterprise" and, at the same time, allege that she was employed by or associated with it. *Id.* ¶ 224. And in addressing Defendants' motion to dismiss, Plaintiffs' response doubles down on their insufficient (and internally inconsistent) allegations of the RICO person and enterprise, affirming that the distinctiveness requirement is met merely because they

have now alleged Mareno as the "person" for purposes of their substantive RICO claim. [69] at 25 ("Specifically, Broydrick's employee, Anna Mareno, is a "person" within the meaning of 18 U.S.C. § 1961(3) who conducted the affairs of the enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).").

This effort fails to understand both the distinctiveness requirement of the enterprise-person rule, and the nature of the RICO "person" as defendant. The statute's plain text makes clear that in a substantive claim under § 1962(c), the "*defendants* are the 'persons' who conduct the 'enterprise's' affairs through racketeering activity." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1110 (D.C. Cir. 2009 (emphasis added) (citing 18 U.S.C. § 1962(c)); *United Food & Comm. Workers*, 719 F.3d 849, 853–54 (7th Cir. 2013) ("Section 1962(c) requires a plaintiff to identify a 'person'—*i.e., the* defendant—that is distinct from the RICO enterprise."); *Said v. Chojnacki*, No. 23-cv-2858, 2023 WL 8451807, at *4 (N.D. Ill. Dec. 6, 2023) ("Separate from the RICO enterprise, the plaintiff must point to a 'person'—that is, the defendant."). Accordingly, to plead a valid RICO defendant, and a RICO enterprise that comports with the statute's distinctiveness requirements, Plaintiffs must allege facts plausibly showing that the RICO "enterprise" it names—the Mahomet Aquifer Contamination Enterprise—is sufficiently "distinct" from the "persons" it seeks to hold accountable *as defendants* under RICO. Plaintiffs have not done so.

In sum, Plaintiffs have not cured their complaint's prior deficiencies by creating new defects, simply naming Mareno—a non-defendant—as their new RICO

"person" and removing WEC, Peoples Gas, and Broydrick as their identified "persons." Quite simply, mere membership within the alleged association-in-fact does not, without more, subject these latter three entities to any civil RICO liability.

Because this Court will give Plaintiffs one more opportunity to amend, it notes that the changes to Plaintiffs' current complaint appear to rest on the mistaken view that an enterprise's members cannot also be named as "persons" under RICO. Although an entity cannot be liable under RICO for operating "*itself* unlawfully," *see Baker v. IBP, Inc.*, 357 F.3d 685, 691–92 (7th Cir. 2004), a plaintiff may state a RICO claim against each member of an association-in-fact enterprise where that enterprise is sufficiently distinct (via RICO roles, purposes, relationships, or otherwise), and even complete identity between the alleged "persons" and enterprise membership is not fatal, *Haroco*, 747 F.2d at 401. This is true because "a corporation and an association-in-fact" can "differ substantially with respect to the 'person' element" and where "persons associate 'in fact' for criminal purposes [forming a RICO enterprise], each person" may also be "held liable under RICO for his, her or its participation in conducting the affairs of the association-in-fact through a pattern of racketeering activity." *Id.*[4]

---

[4] Despite Plaintiffs' ongoing drafting struggles, pleading the distinctiveness requirement of the enterprise-person rule is not normally a high hurdle to overcome. For example, "the need for two distinct entities" can be satisfied even "when a corporate employee unlawfully conducts the affairs of the corporation of which he is the sole owner—whether he conducts those affairs within the scope, or beyond the scope, of corporate authority" simply because an individual and a corporation remain separate entities under the law. *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001). On the other hand, if a plaintiff merely alleges a corporation as the defendant person and a RICO enterprise consisting of only "the corporation, together with its officers, agents, and employees" then the two elements (person and enterprise) lack distinction. *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1356 (11th Cir. 2016). The distinction need not be much, but it must be present, and simply identifying the internal parts of a routine corporate structure, without more, is not enough. In short, federal

As noted above, Plaintiffs' allegations run afoul of the distinctiveness requirement because they fail to show how the roles, purposes, or the relationships of the alleged "association-in-fact" membership differs from the intrinsic corporate dynamics of those entities (*i.e.,* the parent, subsidiary, and agent). *See* [51] at 10:11–13. And without a material difference "between the defendant and the 'enterprise' there can be no violation of RICO." *Baker*, 357 F.3d at 692.[5]

Beyond the Complaint's failure to plausibly allege a distinct association-in-fact enterprise, Plaintiffs' RICO claim fails for another reason. To state a valid RICO

courts can easily find distinctions between the person and enterprise (especially in cases involving an association-in-fact enterprise) by looking to the membership of the association, and RICO roles, purposes or relationships contained within the allegations, but such facts are absent from the operative complaint here.

[5] Like the requisite distinction between the persons and association-in-fact enterprise, the RICO statute also requires that the enterprise to be more than just the mere commission of predicate acts. *See United States v. Turkette*, 452 U.S. 576, 583 (1981) ("An 'enterprise' is not a 'pattern of racketeering activity' but is an entity separate and apart from the pattern activity in which it engages."); *United States v. Masters*, 924 F.2d 1362, 1369 (7th Cir. 1991) ("If the 'enterprise is just a name for the crimes the defendants committed, or for their agreement to commit these crimes that was charged separately in the conspiracy count, then it would not be an enterprise within the meaning of the statute."). Nevertheless, even though an "association-in-fact" enterprise must have some ascertainable structure, it need not be "much" more than a bare-bones conspiracy to commit the predicate acts themselves. *Boyle v. United States*, 556 U.S. 938, 948–49 (2009) (explaining the "breadth" of RICO's enterprise concept). In *Boyle*, the Supreme Court outlined the three essential features of an "association-in-fact" enterprise: (1) a purpose; (2) relationships among those associated with the enterprise; and (3) longevity sufficient to permit the associates to pursue the enterprise's purpose. *Id.* at 946–48. The Court then gave examples of how such an enterprise might satisfy this broad structural requirement: "Such a group need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc. Members of the group need not have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach." *Id.* at 948; *see also Jay E. Hayden Foundation v. First Neighbor Bank, N.A.*, 610 F.3d 382, 389 (7th Cir. 2010) (discussing *Boyle* and stating "the RICO offense is *using* an enterprise to engage in a pattern of racketeering activity").

claim, Plaintiffs must allege that Mareno (the new RICO "person") conducted or participated in the enterprise's affairs. 18 U.S.C. § 1962(c). To satisfy this requirement, Plaintiffs must meet the "operation-or-management" test set forth in *Reves,*[6] which requires a showing, for substantive RICO violations, that each defendant conducted or participated in the conduct of the enterprise's affairs, *i.e.,* in the "operation or management of the enterprise itself." *Muskegan Hotels,* 986 F.3d at 698 (quoting *Reves,* 507 U.S. at 185).

The Complaint, however, contains insufficient allegations explaining how the alleged RICO person (Mareno) participated in the operation or management of the enterprise itself. At most, the Complaint suggests that Broydrick hired Mareno for certain public relations tasks assigned by WEC and Peoples Gas, and thereafter, the association-in-fact members (not including Mareno) conferred about "how to handle or respond to the inquiry."[7] [53] ¶¶ 234–245. Thus, Plaintiffs' Complaint fails pass the *Reves* test, at least, as currently drafted.

---

[6] In *Reves,* the Supreme Court resolved a circuit split, holding that for a substantive violation under § 1962(c), the phrase "conduct or participate" requires "some part in directing those affairs" through "operation or management." 507 U.S. at 177–86. The Court explained, however, an enterprise is "operated" not "just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management" and an enterprise also might be "operated" or "managed" by others "associated with" the enterprise "who exert control over it." *Id.* at 184. In other words, a person conducts or participates in the conduct of the affairs of an enterprise if that person uses his or her position in, or association with, the enterprise to perform acts which are involved in some way in the operation or management of the enterprise, directly or indirectly, or if the person causes another to do so. To be associated with an enterprise, a person must be involved with the enterprise in a way that is related to its affairs or common purpose, although the person need not have a stake in the goals of the enterprise and may even act in a way that subverts those goals; and a person may be associated with an enterprise without being so throughout its existence. *See id.* The *Reves* "operation-management" test, as it has become known, is deployed to include, and exclude, certain RICO defendants by examining the connection between the alleged person violating RICO and the affairs or purposes of the alleged RICO enterprise.

[7] In determining whether a defendant is a member of the enterprise, or merely an outside "hireling" earning a "normal" fee, the existence or absence of profit-sharing is a relevant factor, but it is neither

### b. RICO Pattern of Racketeering Activity

Beyond the issues identified above, the Amended Complaint also fails to properly allege the predicate activity. To establish their substantive RICO claim, Plaintiffs must show a pattern of racketeering activity, which "consists, at the very least, of two predicate acts of racketeering committed within a ten-year period." *Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007); *see also Guaranteed Rate, Inc. v. Barr*, 912 F. Supp.2d 671, 684 (N.D. Ill. 2012) (holding civil RICO liability for a substantive violation is limited to persons who have "personally committed" at least two predicate acts of racketeering).

Where, as here, the alleged predicate acts involve fraud, [53] ¶ 236, then the allegations must also contain the requisite specificity to satisfy Rule 9. *Slaney v. The Intern. Amateur Athletic Federation*, 244 F.3d 580, 597 (7th Cir. 2001) (finding "allegations of fraud" within a civil RICO complaint are "subject to the heightened pleading standard" of Rule 9(b)). At a minimum, this requires Plaintiff to show: (1) a scheme to defraud; (2) the intent to defraud; and (3) the use of the mails or wire communications in furtherance of the scheme to defraud. *Corley v. Rosewood Care Center, Inc. of Peoria*, 388 F.3d 990, 1005 (7th Cir. 2004).

Specifically, under the theories alleged here, Plaintiffs must "describe two predicate acts of fraud by each RICO Defendant with some specificity and state the

---

required nor dispositive in the analysis. *MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc.*, 62 F.3d 967, 979 (7th Cir. 1995) (observing that the "operation" of an enterprise includes "foot soldiers" as well as "generals" and can even include a participant's acquiescence in *losing* money to advance the enterprise's goals); *Nesbitt v. Regas*, No. 13-cv-8245, 2015 WL 1331291, at *11 (N.D. Ill. Mar. 20, 2015) (explaining the narrow significance of the profit-sharing language in *Bachman v. Bear, Stearns & Co., Inc.*, 178 F.3d 930, 932–33 (7th Cir.1999)).

time, place and content of the alleged communications perpetrating the fraud, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 726, 729 (7th Cir. 1998) (citing *Slaney v. The Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001); *Lachmund v. ADM Investor Servs., Inc.*, 191 F.3d 777, 784 (7th Cir. 1999)).

In support of their substantive RICO claim, however, Plaintiffs only point to the following "instances of mail and wire fraud" in the current complaint, [69] at 31:

    a. Communications, including telephone calls, emails, texts, and messages between WEC and governmental entities concerning the blow-out and contamination; between Peoples Gas and governmental entities concerning the blow-out and contamination; between WEC, Peoples Gas, and Broydrick concerning the cover-up; and between Peoples Gas, Broydrick, and class members regarding the blow-out, contamination, test results, risks (or purported lack thereof), and remediation;

    b. Wires or checks reflecting the payment of money from WEC and/or Peoples Gas to Broydrick; and

    c. Agreements between the Gas Defendants[8] and Broydrick relating to the scope of the cover-up and their respective roles.

*Id.* (citing [53] ¶ 237). Plaintiffs' vague allegations concerning Items (b) and (c) ("wires or checks" and "agreements between Gas and Broydrick") are plainly insufficient to serve as predicate acts for mail or wire fraud. Falling significantly short of explaining "the who, when, where, and how" of the fraud, such "general allegations" do not satisfy Rule 9. *Guaranteed Rate*, 912 F.Supp.2d at 684.

---

[8] Plaintiffs refer to Peoples Gas and WEC collectively as "Gas Defendants." *See generally* [53].

Plaintiffs' allegations come closer to the mark with respect to Item (a) ("communications between WEC/Peoples Gas and government entities, and between Broydrick and class members"), yet these too fall short. With respect to the predicate acts involving WEC or Peoples Gas, the Amended Complaint fails to specifically allege how the communications perpetrated the scheme to defraud or even that the Plaintiffs or class members knew of such communications, let alone how they might have been defrauded by them.[9] Plaintiffs' allegations concerning Broydrick fare no better. The Complaint identifies—as the only specific predicate acts involving Broydrick—communications between Mareno and five families, *see* [53] ¶¶ 137–147. None, however, contain the requisite level of detail.[10]

---

[9] For example, the Complaint identifies a few communications between WEC or Peoples Gas and government identities, *see* [53] ¶ 75 (WEC's December 16, 2016 phone call to Illinois Emergency Management's Agency hotline); *id.* ¶ 76 (WEC's December 16, 2016 phone call to Illinois EPA); *id.* ¶ 83 (Peoples Gas's January 13, 2017 Incident Report with U.S. Department of Transportation); *id.* ¶ 85, but it fails to allege any nexus between those reports and the scheme to defraud the intended victims (Plaintiffs or the putative class members).

[10] Regarding Family A, the Complaint alleges that Mareno had "'real estate conversations" by phone on "multiple occasions" with "Mr. and Mrs. A" (on unidentified dates) and "[o]in information and belief, Mareno assured them that the leak would be "fully remediated" and "not affect properly values." [53] ¶¶ 138–142. Again, this example fails to allege critical details, including the when, why, and how, of the scheme to defraud. *See Shirley v. Jed Capital, LLC*, 724 F.Supp.2d 910, 914 (N.D. Ill. 2010). On the contrary, the Complaint alleges that Mr. A was not deceived at all, stating instead that Mr. A "clearly stated until he knows more information he is not comfortable making any decision regarding the well relief." *Id.* ¶ 140. Regarding Family B, the Complaint alleges that Mareno spoke with Family B by phone on July 13, 2017, and "Family B advised Mareno that they preferred to have their own plumber depressurize" the equipment installed WEC/Peoples Gas." *Id.* ¶ 143. The Complaint further alleges that 10 days afterward, Peoples Gas/WEC's contractor visited Family B in-person, and then told Mareno that he had a "conversation with homeowners about 'glacial gas verisis[sic] natural gas," which according to Plaintiffs "reflects, on information belief," an "attempt to confuse." *Id.* ¶¶ 143–144. The Complaint fails to provide any details, however, from which this Court can plausibly infer how Mareno confused or otherwise sought to defraud Family B on July 13, 2017. *See Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 341 (7th Cir. 2019) (citing *Emery v. American Gen. Fin., Inc.*, 134 F.3d 1321, 1322 (7th Cir. 1988) ("RICO's pattern element requires more than a plaintiff pointing to others and saying, on information and belief, that those persons received mailings about an allegedly fraudulent loan scheme.")). Moreover, Plaintiff provides no content or context for Mareno's in-person conversations with Family C or Family D suggesting fraud. And Plaintiffs' October 28, 2017 phone conversation with Family E alone, allegedly stating that the natural gas "was not dangerous at all"—

In sum, to meet their pleading burden on Count I, Plaintiffs must allege predicate acts for *each* defendant, and allegations concerning the specifics of those predicate acts—here, mail or wire fraud, consistent with Rule 9. *Limestone Dev. Corp. v. Vill. of Lemont*, 473 F.Supp.2d 858, 873 (N.D. Ill. 2007). Plaintiffs have failed to do so, and thus the Complaint fails to properly allege the "racketeering activity" required under § 1962(c).[11]

### ii. Count II: RICO Conspiracy

In Count II, Plaintiffs also assert a RICO conspiracy claim against Defendants. [53] ¶¶ 261–267. The "essence of a RICO conspiracy violation is the agreement itself." *Inteliquent, Inc v. Free Conferencing Corp.*, 503 F.Supp.3d 608, 632 (N.D. Ill. 2020). Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c)." 18 U.S.C. § 1962(c). Thus, to plead a viable claim under § 1962(d), Plaintiffs must allege that each defendant agreed to participate in "an endeavor which, if completed, would satisfy all of the elements" of their substantive RICO claim—here, a violation of § 1962(c). *Empress Casino Joliet*

---

which is presumably the statement Plaintiffs would identify as a misrepresentation, though not directly alleged—cannot stand on its own as the only predicate act of mail/wire fraud alleged against Broydrick to establish a requisite "pattern" of racketeering activity.

[11] As part of any second amended complaint, of course, Plaintiffs will also have to establish the "pattern" formed by the alleged predicate acts, *Menzies*, 943 F.3d at 337; *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006) (quoting *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1002 (7th Cir. 2004) (noting that to satisfy the pattern element, "the alleged acts of wrongdoing must not only be related" but must also "amount to or pose a threat of continued criminal activity")); and will need to further establish how Plaintiffs' claims of injury arose "by reason of" the alleged RICO violation. *See Holmes*, 503 U.S. at 268; *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457–458 (2006) (describing the proximate causation requirement as a "directness" requirement); *Yegiazaryan v. Smagin*, 599 U.S. 533, 544 (2023) ("The alleged RICO violation must have proximately caused the injury in order for the plaintiff to be able to sue under § 1964(c)."). As to these issues, the current complaint does not pass muster.

*Corp. v. Balmoral Racing Club, Inc.*, 831 F.3d 815, 822–23 (7th Cir. 2016) (citing *Salinas v. United States*, 522 U.S. 52, 65 (1997) (explaining RICO conspirator "need not personally commit two predicate acts in furtherance of the enterprise; rather, he must agree that someone will commit them.")).

Defendants contend that the failure to state a substantive RICO claim automatically renders Plaintiffs' accompanying RICO conspiracy claim "dead on arrival." [60] at 20. This overstates the law. It is true that "the overall objective of the RICO conspiracy claim often mirrors the underlying RICO substantive claim," and this case is no different. *See* [53] ¶ 263. But the demands of § 1962(c) and § 1962(d) are distinct, and the failure of the former does not necessarily mean the failure of the latter. *See, e.g., Fund Recovery Servs. v. RBC Capital Mkts., LLC*, No. 20-cv-5730, 2022 WL 142404, at *11 (N.D. Ill. Jan. 17, 2022) ("Because liability under section 1962(d) is not coterminous with liability under section 1962(c), the Court must examine the RICO conspiracy claim, despite dismissing the substantive RICO claim.").

For example, here the Complaint failed to state a claim under § 1962(c) against the RICO person under the *Reves* "operation-and-management test," but the flaw, without more, would not necessarily doom Plaintiffs' RICO conspiracy claim. *See Brouwer v. Raffensperger, Hughes, & Co.*, 199 F.3d 961, 966 (7th Cir. 2000) (holding that to "conspire to commit a subsection (c) offense, one would not need, necessarily, to meet the *Reves* requirements" because a conspirator could agree "not to operate or manage the enterprise," but rather "personally to facilitate the activities of those who

do"); *see also Goren,* 156 F.3d at 731) ("a defendant can be charged under § 1962(d) even if he cannot be characterized as an operator or manager of a RICO enterprise under *Reves*").

Nevertheless, the Complaint's failure to sufficiently plead the predicate acts of mail and wire fraud under Rule 9 is fatal for Count II, because one of the objectives of civil RICO conspiracy must be the intended commission of a proper pattern of racketeering activity. *Brouwer*, 199 F.3d at 963–64 (stating that RICO conspiracy requires the defendant to agree to facilitate a *pattern* of racketeering activity); *see also Meier v. Musburger*, 588 F.Supp.2d 883, 911–912 (N.D. Ill. 2008) (collecting cases dismissing RICO conspiracy claim based upon failure to sufficiently allege RICO "pattern" objective of agreement); *Midwest Griding Co. v. Spitz*, 976 F.2d 1026 (7th Cir. 1992) (finding no need to further address § 1962(d) claim where it was "also premised on the existence of a pattern of racketeering," and there was no intended pattern); *J.D. Marshall Int'l, Inc. v. Redstart, Inc.*, 935 F.2d 815, 820 (7th Cir. 1981) (explaining "a crucial element of a claim under § 1962 is the existence of "a pattern of racketeering activity" as an objective of the conspiracy, and thus, the failure of this element "rings the death knell" of plaintiff's §§ 1962(c) and (d) claims); *Glen Flora Dental Center, Ltd. v. First Eagle Bank,* No. 17-cv-9161, 2018 WL 4300478, at \*6–9 (N.D. Ill. Sept. 10, 2018) (dismissing § 1962(d) claim which rested upon same facts as substantive RICO claim where complaint failed to plead predicate acts of wire fraud with sufficient particularity to state a § 1962(c) violation).

In sum, just as the Complaint fails to allege that Defendants engaged in a pattern of racketeering, it equally fails to plausibly allege that Defendants *agreed* that a RICO conspirator would "conduct or participate in the affairs of an enterprise through a pattern of racketeering." *See Muskegan Hotels*, 966 F.2d at 699; *see also Fund Recovery Servs.*, 2022 WL 142404, at *12 (stating given court's conclusion that plaintiff failed to adequately allege a pattern of racketeering activity, "it follows that [plaintiff] has also failed to adequately allege that the defendants agreed to engage in a pattern of racketeering activity").

Accordingly, this Court grants Defendants' motion to dismiss Count II, alleging violations of § 1962(d), without prejudice.

### B. State Law Claims

#### 1. Claims Against WEC

Plaintiffs bring state tort law claims against WEC for negligence (Count III), strict liability for ultra-hazardous activity (Counts IV and V), private nuisance (Count VI), and trespass (Count VII). [53] ¶¶ 268–305. Plaintiffs seek to hold WEC liable only on a direct participant theory of liability, [69] at 24, so this Court will limit its analysis to whether Plaintiffs have sufficiently alleged that WEC may be liable on that basis.

The Illinois doctrine of direct participant liability is an exception to the general corporate law principle that a parent company is not liable for the acts of its subsidiaries. *See United States v. Bestfoods*, 524 U.S. 51, 61 (1998). Under this doctrine, "a parent company may be liable for the alleged wrong of its subsidiary when

the alleged wrong can seemingly be traced to the parent through conduit of its own personnel or management," and "the parent has interfered with the subsidiary's operations in a way that surpasses the control exercised by a parent as an incident of ownership." *Forsythe v. Clark USA, Inc.*, 864 N.E.2d 227, 227, 235 (Ill. 2007); *Northbound Group, Inc. v. Norfax, Inc.*, 795 F.3d 647, 651 (7th Cir. 2015). Where direct participant liability applies, a plaintiff can maintain claims against both a parent company and its subsidiary for the wrongdoing alleged. *See, e.g., Golbert*, No. 19-cv-8257, 2021 WL 952528, at *3 (N.D. Ill. Mar. 11, 2021) (allowing negligence and negligent hiring claims to proceed against parent and subsidiary).

The "key elements" to the application of direct participant liability are "a parent's specific direction or authorization of the manner in which an activity is undertaken and foreseeability." *Forsythe*, 864 N.E.2d at 237. Thus, a parent company may be liable for foreseeable injuries where it directs or authorizes "the manner in which an activity is undertaken" or "mandates an overall course of action and then authorizes the manner in which specific activities contributing to that course of action are undertaken." *Id.* But a parent corporation may not be liable for "allegations of mere budgetary mismanagement." *Id.*

Applying these principles, the Court finds that Plaintiffs have sufficiently alleged a basis to hold WEC liable under a direct participant theory for the state law tort claims against it. The Complaint alleges that WEC "mandates the overall course of well monitoring and maintenance of Manlove field" and has "management control over Manlove field." [53] ¶¶ 96, 127. WEC employees "handle and direct operations

at Manlove Field," including "monitoring and compliance," and "WEC manages services at Manlove Field with full authority to direct Peoples Gas employees or contractors." *Id.* ¶ 109.

As for WEC's direction or authorization of specific activities, the Complaint alleges that, in 2017, WEC's Asset Manager "directed the storage operator and chemists [of Peoples Gas to] return to the Mahomet area to canvass homes check for additional issues resulting from the gas leak." *Id.* ¶ 105. The Complaint further alleges that following the gas leak, WEC spearheaded the cover-up efforts. For example, WEC "established and directed" a "crisis management" team by hiring Broydrick to deter homeowners from seeking remediation, *see id.* ¶ 246, and in 2017, a WEC Asset Manager directed a former Peoples Gas employee to "prepare talking points in response to the gas leak at Manlove field," *id.* ¶ 104 ("noting Peoples Gas employees "report directly to WEC when media coverage occurs" and "WEC in turn facilitates public relations services"). These actions, both directed and authorized by WEC, delayed remediation and contributed to the ongoing contamination and property damage that underlie Counts III—VII.

Going beyond the control normally "exercised by a parent as an incident of ownership," *Forsythe*, 864 N.E.2d at 235, these allegations reflect significant direction and authorization on the part of WEC, such that WEC was "directly a participant in the wrong[s] complained of." *See Bestfoods*, 524 U.S. at 64.

Having found that Plaintiffs have sufficiently alleged a basis to hold WEC liable as a "direct participant," this Court rejects Defendants' argument that WEC

did not owe Plaintiffs a duty of care. The Illinois Supreme Court's decision in *Forsythe* held that where a parent corporation engages in conduct subjecting it to direct participant liability, it "must do so with reasonable care." 864 N.E.2d at 238. Stated differently, where a parent company directs or authorizes the conduct of its subsidiary, it has a "duty to do so in a nonnegligent way." *Id.* at 240; *see also Golbert v. Aurora Chicago Lakeshore Hosp.*, *LLC*, No. 19-cv-08257, 2021 WL 952528, at *8 (N.D. Ill. Mar. 11, 2021) (rejecting defendant's argument that parent company could not be held liable in negligence because it did not owe a duty to plaintiffs after determining it was liable for subsidiary's actions under a direct participant liability theory). Therefore, the Court denies Defendants' motion to dismiss on this basis. Counts III, VI, and VII may proceed against WEC.

### C. Jurisdiction of the Illinois Commerce Commission

Before considering the substance of Plaintiffs' strict liability and breach of contract claims, the Court first addresses Defendants' argument that the ICC has exclusive jurisdiction over those claims. [60] at 31.

The Illinois Commerce Commission is a product of statute, specifically, the Public Utilities Act of 1921. 1921 Ill. Laws 702; *Zahn v. North American Power & Gas, LLC*, 815 F.3d 1082, 1088 (7th Cir. 2016). The Illinois Supreme Court has "long recognized" that the ICC "exists for the function of maintaining a balance between the rates charged by utilities and the services performed," and to ensure that those rates are "just and reasonable." *Zahn,* 815 F.3d at 1088 (citing *Vill. Of Apple Rover*

*v. Ill. Commerce Comm'n*, 165 N.E.2d 319, 332 (Ill. 1960); 1921 Ill. Laws 722; 220 Ill. Comp. Stat. 5/9-201(c).

To accomplish this goal, Section 9-252 of the Public Utilities Act lodges "exclusive jurisdiction" in the ICC over claims involving rates.[12] *Sheffler v. Commonwealth Edison Co.*, 955 N.E.2d 1110 (Ill. 2011) (citing 220 Ill Comp. Stat. 5/9-252). In *Sheffler,* the Illinois Supreme Court clarified the exclusive jurisdiction of the ICC, stating that it applies to "reparations" claims, "when the essence of a claim is that a utility has charged too much for a service." 955 N.E.2d at 1113. By contrast, the court explained that claims for other violations of the Act are vested in the circuit courts, pursuant to Section 5-201 of the Act.[13] *Id.*

*Sheffler* involved a claim by customers of ComEd, who sued the company under the Public Utilities Act after a series of severe storms in Chicago resulted in power outages. *Id.* at 1114. In determining whether the claim fell within the ICC's jurisdiction, the court stated that the focus is "on the nature of the relief sought," there, "compensation for ComEd's allegedly inadequate service." *Id.* The court

[12] Section 6-262 provides, "When complaint is made to the Commission concerning any rate or other charge of any public utility and the Commission finds, after a hearing, that the public utility has charged an excessive or unjustly discriminatory amount for its product, commodity or service, the Commission may order that the public utility make due reparation to the complainant therefor, with interest at the legal rate from the date of payment of such excessive or unjustly discriminatory amount." 220 Ill. Comp. Stat. 5/9-252.

[13] Section 5-201 provides, "In case any public utility shall do, cause to be done or permit to be done any act, matter or thing prohibited, forbidden or declared to be unlawful, or shall omit to do any act, matter or thing required to be done either by any provisions of this Act or any rule, regulation, order or decision of the Commission, issued under authority of this Act, the public utility shall be liable to the persons or corporations affected thereby for all loss, damages or injury caused thereby or resulting therefrom, and if the court shall find that the act or omission was willful, the court may in addition to the actual damages, award damages for the sake of example and by the way of punishment. An action to recover for such loss, damage or injury may be brought in the circuit court by any person or corporation." 220 Ill. Comp. Stat. 5/5-201.

concluded that such relief "directly relates to the Commission's rate-setting functions for electrical power services," in other words, ensuring that the rates charged are reasonable in connection with the services performed. *Id.* Accordingly, the court held that the ICC was vested with exclusive jurisdiction over the plaintiffs' claim. *Id.*

Here, neither Plaintiffs' strict liability claims, nor breach of contract claims, are predicated on allegations of inadequate service by a public utility company in connection with rates charged. The claims also do not involve claims that Peoples Gas "charged too much for a service." *Sheffler*, 955 N.E.2d at 1113. Defendants argue that these claims fall within the exclusive jurisdiction of ICC simply because they involve a utility's "infrastructure," [77] at 21, but this analysis takes *Sheffler* too far. The *Sheffler* court referenced "infrastructure" and services in connection with customers' claims that a public utility's services were inadequate. No similar claims are raised here; according to the Complaint, Peoples Gas's sole "connection" to the Plaintiffs is the property damage it allegedly caused. It does not provide services to Plaintiffs that have been deficient, nor has it ever charged Plaintiffs rates. As a result, jurisdiction over Plaintiffs' strict liability and breach of contract claims does not lie exclusively in the ICC, but instead in state trial courts, pursuant to section 5-201 of the Act.

### D. Strict Liability Claims (Counts IV and V)

In Counts IV and V, Plaintiffs bring strict liability claims against WEC and Peoples Gas, for "owning, constructing, operating, managing, and maintaining Manlove Field," a storage facility for natural gas, hazardous gas, chemicals, and the

like, [53] ¶ 275 (Count IV), and "storing and distributing natural gas through aged, deteriorated, and unmaintained pipes and storage facilities," *id.* ¶ 286 (Count V) emphasis added).[14]   Plaintiffs claim these actions constituted ultra-hazardous activities, causing physical damage, and diminishing the value of their properties. *Id.* ¶¶ 282–284, 289.

Under Illinois law, a defendant who engages is an "abnormally hazardous" or "ultrahazardous" activity[15] is strictly liable for damages resulting from the activity. *G.L. Leasing Co., Inc. v. Union Elec. Co.*, 54 F.3d 379, 386 (7th Cir. 1995) (citing *Indiana Harbor Belt R.R. v. American Cyanamid Co.*, 916 F.2d 1174 (7th Cir. 1990)). Whether an activity qualifies as "ultrahazardous" is a question of law for the Court to decide. *Ne. Illinois Reg'l Commuter R.R. Corp. v. Kiewit W. Co.* 396 F. Supp. 2d 913, 922 (N.D. Ill. 2005); *see also In re Chicago Flood Litigation,* 680 N.E.2d 265, 280 (Ill. 1997) (citing Restatement (Second) of Torts § 520, Comment *l*, at 42 (Am. L. Inst. 1977)); *Martin v. Civil Constructors, Inc.*, 651 N.E.2d 239, 244 (Ill. App. Ct. 1965) (stating the "essential question" is whether the "risk was so unusual that the imposition, either because the magnitude or because of the circumstances surrounding it, as to justify the imposition of strict liability even though the activity is carried on with all reasonable care").

---

[14] In their motion, Defendants characterize Counts V as a negligence-based claim, likely due to its language that WEC and Peoples Gas "knew or should have known" that its failure to maintain the condition of their wells posed a danger, *see* [53] ¶ 287. But the Complaint characterizes Defendants' "failure to maintain" as an "ultrahazardous activity," subjecting these defendants to a "strict liability" theory. *See id.* ¶¶ 287–288, 291. And Plaintiffs' response clarifies that it intends this claim to sound in strict liability. *See* [69] at 21–22. This Court assesses the sufficiency of the allegations accordingly.

[15] The Illinois state courts use "abnormally hazardous" activities and "ultrahazardous" activities interchangeability. *In re Chicago Flood Litigation*, 860 N.E.2d 265, 280 (Ill. 1997).

Defendants first argue that operating a regulated natural gas storage facility is not an ultrahazardous activity as matter of law in Illinois. As support, Defendants cite *Nelson v. Tatum v. Commonwealth Edison Co.*, 465 N.E.2d 513, 522 (Ill. Ct. App. 1984), and *Adams v. Northern Illinois Gas Co.*, 809 N.E. 1248 (Ill. 2004). The Court finds these cases persuasive.

In *Nelson*, a plaintiff brought a strict liability claim against Commonwealth Edison Co. (ComEd) after her son suffered serious electrical burns when a wire he was holding came in contact with uninsulated high voltage wires that ran over a public playground. 465 N.E.2d at 514. In dismissing the plaintiff's claim, the court first acknowledged that "Illinois courts have characterized electricity as a 'silent, deadly and instantaneous force,'" but stated this "does not mandate the imposition of absolute liability upon electrical power companies." *Id*. at 522 (quoting *Merlo v. Public Service Co.*, 45 N.E.2d 665 (Ill. 1942); *Spence v. Commonwealth Edison Co.*, 340 N.E.2d 550 (Ill. App. Ct. 1975)). Rather, "the concept of absolute liability is reserved only for abnormally dangerous activities for which no degree of care can truly provide safety" and Illinois has not imposed absolute liability on power companies "because of the obvious social and economic burdens." *Id*. Therefore, the court held that Illinois law does not impose strict liability upon electronic power companies. *Id*. at 523. It explained:

> There is a clear distinction between requiring a defendant to exercise a high degree of care when involved in a potentially dangerous activity and requiring a defendant to absolutely insure the safety of others when engaging in an ultra hazardous activity; Illinois has held electrical power companies only to the former standard.

*Id.* at 522.

In considering *Nelson*'s application to the liability of gas utility companies, the Court finds *Adams* instructive. There, the decedent was killed in a house explosion caused by the failure of a gas connector connecting her kitchen to its gas supply, and the administrator of her estate brought a wrongful death action against Northern Illinois Gas Company. *Adams,* 809 N.E.2d at 1253. Discussing the gas utility company's liability, the court explained:

> Gas is a dangerous substance or commodity when it is not under control. However, *a gas company is not liable as an insurer* for injuries sustained as the result of the escape of gas. Rather, the company is liable for its negligence in permitting the gas to escape. Expressions of the degree of care that a gas company must exercise range from "reasonable" to "high." This variety of expression simply means that a gas company must exercise a degree of care to prevent the escape of gas from its pipes commensurate with or proportional to the level of danger which it is the company's duty to avoid.

*Id.* at 1257–58 (emphasis added).

Thus, Illinois law does not require gas companies to serve as "insurers" for their activities—subjecting them to strict liability for damages caused by the escape of gas, but instead only requires gas companies to exercise a "high degree of care," commensurate with the risks their conduct poses. *See Nelson*, 465 N.E.2d at 522; *Adams,* 809 N.E.2d at 1257–58. Accordingly, Plaintiffs cannot maintain their strict liability claims against WEC and Peoples Gas.

Contending that strict liability applies to Defendants' activities, Plaintiffs cite several cases which, like *Adams,* assert in various ways that "gas is dangerous" and companies must take reasonable care to protect against injury. For example,

Plaintiffs cite *Metz v. Central Illinois Electric and Gas Company*, in which the Illinois Supreme Court stated that gas "is a dangerous commodity, and the corporation which undertakes to furnish such services must exercise a degree of care commensurate to the danger" and "must use every reasonable precaution in guarding against injury to the person or property of others," 207 N.E.2d 305, 308 (Ill. 1965).

Not one of the cases cited by Plaintiffs, however, finds that the storage or distribution of natural gas qualifies as an "ultrahazardous" activity; in fact, Plaintiffs cite no case applying Illinois law in which a strict liability claim was maintained against a gas company for any of its activities. And the mere fact that "gas is dangerous" is insufficient, because strict liability attaches only to "abnormally dangerous *activities*, not substances" under Illinois law. *G.J. Leasing Co. v. Union Elec. Co.*, 854 F.Supp. 539, 568 (S.D. Ill. 1994) (emphasis added); *Indiana Harbor Belt R.R. CO. v. American Cyanamid Co.*, 916 F.2d 1174, 1181 (7th Cir. 1990). Finding no basis to depart from the rule articulated in *Nelson*, this Court finds that the storage and distribution of natural gas is not an ultrahazardous activity under Illinois law for which strict liability can be imposed, and grants Defendants' motion to dismiss with respect to these claims. Therefore, Counts IV and V are dismissed with prejudice.

### E. Breach of Contract & Rescission Claims (Counts VIII and IX)

In Count VIII, Plaintiffs bring a breach of contract claim against Peoples Gas, individually and on behalf of putative Real Estate Easement Subclass,[16] and in Count IX, Plaintiffs seek rescission of contract. [53] ¶¶ 306–317. To maintain a claim for breach of contract under Illinois law, Plaintiffs must allege: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) damages." *Gociman v. Loyola Univ. of Chi.*, 41 F.4th 873, 883 (7th Cir. 2022) (citing *Babbitt Muns., Inc. v. Health Care Serv. Corp.*, 64 N.E. 3d 1178 (Ill. App. Ct. 2016)). It is not enough for Plaintiffs to allege that Peoples Gas' performance was "not good enough." *Gociman*, 41 F.4th at 882, 884. Rather, Plaintiffs must "point to an identifiable contractual promise that the defendant failed to honor." *Id.*

As to Count IX, an action for rescission involves an equitable remedy that results in the judicial termination of a party's contractual obligations. *Facility Wizard Software, Inc. v. Southeastern Technical Services, LLC*, 647 F.Supp.2d 938, 948 (N.D. Ill. 2009) (citing *Jones v. InfoCure Corp.*, 310 F.3d 529, 525 (7th Cir. 2002)). This remedy is available where the "contract was materially breached" and "the parties can be returned to the positions they would have occupied at the time the contracts were executed." *Facility Wizard Software, Inc.*, 647 F.Supp.2d at 948 (citing

---

[16] The Complaint defines the "Real Estate Easement Subclass" as "All persons who have owned real property in rural Mahomet, Illinois, or Fisher, Illinois area during any period between October 28, 2015 and the present." [53] ¶ 203.

*Alexian Bros. Health Providers Ass'n v. Humana Health Plan, Inc.*, 227 F.Supp.2d 880, 889 (N.D. Ill. 2003)).

The Complaint alleges that Peoples Gas breached the terms of the easement agreements it entered with various property owners who owned the land below which the natural gas was stored, entitled "Gas Storage Grant – Oil Lease." *Id.* ¶¶ 44–50, 307. These agreements granted Peoples Gas, in relevant part:

> the exclusive right, privilege, and authority to introduce natural gas or other gases or vapors . . . into any geological strata underlying said land . . . (all such strata being referred to as the "Storage Reservoir"); to store gas in the Storage Reservoir and to retain the possession of gas so stored as personal property; to remove gas . . . from the Storage Reservoir; and to use, hold, and occupy the Storage Reservoir for all such purposes and in connection therewith and with exploratory operations incidental thereto . . .and to do and perform such other acts and things as may be necessary for all foregoing purposes; all as part of and in connection with the gas storage project for the storage of gas to be conducted on and under said land and lands in the vicinity thereof.

[53-1] at 1.

These agreements then set out Peoples Gas' obligations with respect to the rights, privileges, and authorizations therein granted:

> Grantee shall, in the course of all operations *in this Agreement authorized*, use due care to protect Grantor's water supply. In the event it is demonstrated that a source of water supply presently used by Grantor is interrupted by Grantee's operation, Grantee shall provide an alternative source of water to Grantor for domestic and agricultural use during such period as Grantor's water supply is so interrupted.

*Id.* (emphasis added).

The Complaint alleges that Peoples Gas breached the terms of this "due care" provision by: (1): "releasing natural gas, non-potable saltwater and/or other chemical compounds and pollutants into the freshwater supply" on Plaintiffs' property; (2) "failing to use due care to protect the freshwater supply" on Plaintiffs' property; and (3) "failing to provide Plaintiffs and the Class members with an alternative source of freshwater" following its "contamination" of their freshwater source. *Id.* ¶¶ 310–312.

Defendants argue that the easement agreements limit the "due care" that Peoples Gas was required to exercise, to actions "in the course of operations *in this Agreement authorized*," yet the conduct underlying Plaintiffs' claims did not arise from Plaintiffs' operations authorized under the easement agreements. [60] at 39. Instead, Defendants argue, Plaintiffs' claims stem from gas release from the L. McCord well, which caused gas to enter the aquifer and ultimately migrate to the water well on Plaintiffs' property. *Id.* But the well is "not located on Plaintiffs property," nor is it "governed by the Gas Storage Grant," and the easement agreements surely did not govern "*all* of Peoples Gas's operations across Champaign County." *Id.*

Plaintiffs counter that the "due care" provision extends to the "entire gas storage project, including upon the 'lands in the vicinity' of Plaintiffs' properties." [69] at 23. As a result, Plaintiffs argue that the drilling of the L. McCord Well is also "authorized" by the agreement, and therefore the "due care" provision applies to it. The Court agrees with Defendants.

This Court interprets the easement agreements as any other contract. In interpreting these agreements, this Court's objective is to give effect to the intent of the parties at the time the agreements were made. *Pepper Construction Co. v. Palmolive Tower Condominiums, LLC*, 194 N.E.3d 991, 1013 (Ill. App. Ct. 2021). Where, as here, the language of agreements is clear and unambiguous, the Court will glean the parties' intent solely by the language of the agreements and give the terms their "plain and ordinary meaning." *Id.* (citing *Storino, Ramello, and Durkin v. Rackow*, 45 N.E.3d 307, 312 (Ill. App. Ct. 2015)). Additionally, this Court will interpret the agreements "as a whole, rather than focusing on isolated portions." *Pepper Constr. Co.,* 194 N.E.3d at 1013 (citing *Assocs. Assert Mgmt. LLC v. Cruz*, 144 N.E.3d 169, 174 (Ill. App. Ct. 2019)).

The easement agreements grant Peoples Gas the "exclusive right, privilege, and authority" to take certain actions. [53-1] at 1. These rights include the ability to introduce natural gas under Plaintiffs' properties, store it there, remove it, drill wells, pipelines, and other structures on or under Plaintiffs' properties, and "to do and perform such other acts and things as may be necessary for all foregoing purposes." *Id.* These items are the actions or operations "authorized" under the agreement, which the "due care" clause modifies. Although the contract states that these operations are "all as part of and in connection with" a wider "gas storage product" that will be conducted "in the vicinity" of Plaintiffs' properties, those other activities— having no relation to Plaintiffs' properties whatsoever—are not "authorized" by the easement agreement with Plaintiffs.

The "interruption of water supply" referenced in the agreements is similarly limited. Under the agreements, if the "Grantee's operation" interrupts the source of water supply, it must provide Grantors an alternative water source. *See id.* But this provision too is modified by the sentence immediately preceding it, which unambiguously limits the relevant "Grantee's operations" to those "in this Agreement authorized." *See id.* Thus, this Court rejects Plaintiffs' reading of the easement agreements, and as a result, finds that Plaintiffs have failed to plausibly allege that Peoples Gas took or failed to take any action in breach of the easement agreements.

Having failed to establish "breach," let alone "material breach," Plaintiffs' breach of contract and rescission claims fail. *Facility Wizard Software*, 647 F.Supp.2d at 948. The Court grants Defendants' motion to dismiss Counts VIII and IX, without prejudice.

## IV.  Conclusion

For the reasons explained above, the Court grants in part, and denies in part, Defendants' motion to dismiss, [59].  Plaintiffs' RICO claims (Counts I and II), and breach of contract claims (Counts VIII and IX) are dismissed without prejudice.  If Plaintiffs believe that they can amend these allegations to plead viable RICO and breach of contract claims consistent with their obligations under Rule 11, then Plaintiffs shall amend their Complaint by May 30, 2024.  Plaintiffs' strict liability claims (Counts IV and V) are dismissed with prejudice.  Plaintiffs' surviving state law claims (Counts III, VI, and VII) may proceed against WEC and Peoples Gas.

Dated:  March 31, 2024                Entered:

John Robert Blakey
United States District Judge